HENRY L. GOODWIN, ADMINISTRATOR, *vs.* THE AMERICAN NATIONAL BANK.

*P* having in the respondent bank an account as town treasurer and a private account, transferred $3,200 from the latter to the former, and afterwards an equal sum from the former to the latter, and drew $8,132 from his treasurer's account by checks payable to bearer. Later he had an additional account in the bank as executor of his father, and applied to the bank to discount his note as executor for $10,000 at four months, and offered certain stock, belonging to the estate, as security, telling the president of the bank that it would be for the benefit of those interested in the residue of the estate, of whom he was one, to pay at once certain legacies by borrowing money and holding the stock for a more favorable market. Thereupon the bank, in good faith, discounted the note and took the stock as collateral. *P* deposited the proceeds on his private account. Soon afterwards the bank paid $3,745,

from his private account, on his check in favor of a third person, and by his direction transferred $7,321 from his private account to his treasurer's account. Successive renewal notes, covering about four years, were given for the $10,000, the last of which was never taken up by him. He subsequently fled from the state, largely in default both as executor and as treasurer. Before his flight, he was publicly regarded as a man of integrity. The petitioner was appointed administrator with the will annexed in his place. On a bill in equity against the bank seeking the transfer of the stock to the petitioner as such administrator, it was held—

1. That the declared purpose for which *P* sought the $10,000 loan was a proper one, and the loan therefore one which the bank, so long as it had no knowledge of his fraudulent intent, could properly make.
2. That the bank was under no obligation to see to the application of the money.
3. That as the purpose for which the loan was sought was one that would naturally require considerable time for its accomplishment, the bank was not bound to regard as suspicious *P's* application for repeated renewals of the note.
4. That the mingling of the trust funds by *P* with his own was within his power as trustee, and was not in itself unlawful; so that the bank was under no obligation to suspect fraud from his doing it.
5. That the bank was under no obligation to regard the acts of *P* as fraudulently intended unless it had actual knowledge of such intent, or of facts which afforded convincing proof of it.

The contract of a bank with a depositor is that it will pay his checks upon his funds in the bank, and if the checks are properly drawn it is bound to pay them.

The law will not charge the officers of a bank with knowledge that a depositor is committing a fraud, nor impose upon them the duty of inquiry, simply because he is drawing upon a trust account checks payable to himself, or is transferring funds from a trust account to his private account.

BILL IN EQUITY by an administrator, to compel the transfer of stock to himself as such administrator; brought to the Superior Court for Hartford County, and tried before *Beardsley, J.* The following facts were found by the court:—

Ralph Pitkin of East Hartford died in August, 1874, leaving a will and making his son, L. T. Pitkin, his sole executor. The will was duly proved in the probate court on the 26th of August, 1874, and L. T. Pitkin accepted the trust, and proceeded with the settlement of the estate. On the 29th of September, 1874, he applied to the respondent bank for the discount of a note of $10,000, of that date, signed by him as executor of Ralph Pitkin, and payable at

the bank four months after date, and offered as security for its payment seventy-five shares of the stock of the Ætna Fire Insurance Company belonging to the estate. He told the president of the bank that the heirs of the estate wanted money, and that he wished to pay certain legacies given by the will and as to the time for the payment of which he had discretion, that the stocks belonging to the estate were likely to increase in value, and that in his opinion it was better to borrow money than to sell the stocks at that time. The bank thereupon, in good faith, discounted the note, and took as security a conveyance of the seventy-five shares of stock and a power of attorney authorizing its cashier to transfer the same.

Prior to and on the 29th of September, 1874, L. T. Pitkin had three accounts with the respondent bank:—one, an individual account, which had run since March 1st, 1872, and upon which there was then due to him $1,016; one an account with him as treasurer of the town of East Hartford, which had run since November 4th, 1872, and upon which there was then due to him $1,436.51; and one, an account with him as executor, which had run since the 2d day of September, 1874, and upon which there was due to him on the 29th of September, 1874, $2,587.10, the remnant of $9,521.24 which stood to the credit of Ralph Pitkin as executor at the time of his decease in another bank, and was by L. T. Pitkin as executor of his father's estate drawn and deposited with the respondent bank. When he so deposited it he told the president of the bank that it was money which had been holden and deposited by his father as executor, but did not tell him of whom.

Upon the discount of the note for $10,000, on the 29th of September, 1874, the sum of $9,726.67, being the proceeds of the same less the interest as agreed upon, was by direction of Pitkin given to the teller of the bank and credited to his individual account.

This sum of $10,000 has never been paid, but renewal notes of the same tenor have been given, dated regularly at the expiration of periods of four months since the 29th of

September, 1874, the last of the notes bearing date the 28th of September, 1878. This note has never been taken up by Pitkin and is now holden by the bank. Upon the discount of the first and second of the renewal notes the same credit was given to Pitkin on his individual account, in paying the discount on the notes from that account. The net proceeds of the third and of the succeeding renewal notes were, by direction of Pitkin to the teller of the bank, credited to him as executor, except the fourth renewal note, as to which a different mode of bookkeeping was adopted which it is not important to detail. The discount upon all the renewal notes after the second was paid by Pitkin from the executor's account.

On the 1st of October, 1874, the bank paid Pitkin's individual check of that date, drawn for his private use and payable to the order of a person in Hartford, for the sum of $3,745. On the 8th of October, 1874, the bank paid his individual checks of that date for $7,321.87, transferring that amount, by his direction, from his individual account to the credit of his account as treasurer of East Hartford. Pitkin deposited to his individual credit on the 8th of October, 1874, $1,193.50, before the last-mentioned check was paid, and between the 1st and the 8th drew some small checks against his individual account, so that after the payment of the checks, on the 8th of October, 1874, there stood to his individual credit $786.97.

The sum of $7,321.87, when transferred as stated from the credit of his individual account to the credit of his account as treasurer, was just sufficient to meet a deficiency in the credit side of that account, created by his having drawn checks signed by himself as treasurer of East Hartford for his private use and payable to himself as bearer, which were cashed by the bank, but never to such an amount as to overdraw his account as treasurer. These checks were eleven in number, drawn between November, 1872, and October, 1873, and aggregated in amount $11,332.28. One drawn April 15th, 1873, for $200, was credited directly over to his individual account. One drawn July 3d, 1873, for

$3,000, was also credited directly over to his individual account. On the 18th of March, 1872, he drew a check for $3,200 on his individual account, which was then by his direction credited directly over to his treasurer's account. After the first discount of the $10,000 note, and before the second renewal of the note fell due on the 8th of October, 1875, various sums amounting in the aggregate to $5,767 had been credited by the bank to Pitkin's executor's account. The balance then to the credit of his executor's account was $1,260.66, and the balance to the credit of his individual account was then $798.48.

All of these transactions of Pitkin with the bank in drawing checks and making deposits were between him and the teller, and it did not appear that the attention of the president or cashier or any other officer of the bank was called to the matter, or that they had any knowledge of the transactions during the time covered by them. The respondents offered evidence to prove that it was not the practice in the bank for the president or cashier to inspect the items of the accounts of its customers, unless in consequence of overdrafts or for some other particular reason their attention was called to them.

This evidence was received subject to the objection of the petitioner. If the same is admissible, the fact is found in accordance with the evidence. All the evidence offered by the petitioner to prove the state of the accounts between Pitkin as treasurer of East Hartford and the town, and the evidence as to the checks which were drawn by him as such treasurer, and the deposits which were made by him to the credit of such account, was received subject to the objection of the respondents, and the facts in relation thereto are found subject to such objection.

Pitkin left the state in the summer of 1878, largely in default as executor, and also as treasurer of East Hartford. At that time he had overdrawn his executor's account to the amount of $749,98, which sum with interest from the first day of August, 1878, is now due to the respondents. Afterwards he was removed from his office as executor, and

the petitioner was appointed administrator on the estate with the will annexed.

Before the 1st day of October, 1878, the respondents caused the Ætna Fire Insurance stock received of Pitkin to be transferred to themselves, and have since received the dividends upon the same, amounting to $3,375.

During all the time of his transactions with the bank Pitkin was publicly reputed to be a man of integrity, and was so regarded by the officers of the bank.

The case was reserved upon these facts for the advice of this court.

*R. D. Hubbard*, for the petitioner.

1. We claim that the bank, subsequently to the first discount, acquired knowledge, or means of knowledge, that the executor was using the loan to enable himself to apply the trust fund to his private use; and after such knowledge or means of knowledge, suffered the loan to be repeatedly renewed; and thereby discharged the pledge as between the bank and the estate. The question relates to the right to hold the pledge, not for the first note discounted, but for the last. Premising that the law strives to protect the interests of the *cestuis que trust*, (*Smith* v. *Ayer*, 101 U. S. R., 327; *Colt* v. *Lasnier*, 9 Cowen, 342; *Duncan* v. *Jaudon*, 15 Wall., 175; *Collinson* v. *Lister*, 7 DeG., M. & G., 637;) we suggest the following facts: The whole discount, as soon as made, was placed on the books of the bank to the private account of Pitkin—not a cent of it to the executor's account. The very first act of the executor in the disposition of the trust fund was a breach of duty as trustee; for the obvious effect of it was to obliterate the identity and trust character of the fund, and to subject it to attachment by his creditors and to his own private uses, precisely as if it were his own individual estate. The fact that a trust estate bears on its face the marks of the trust, constitutes, and is intended by law to constitute, its safeguard and protection both as against the public and the trustee. The bank then knew that the first thing done to the fund preparatory to its use

by the executor was to take from it its trust marks, to
stamp on it his own private marks, and thus to unclothe it
of all the immunities and protection with which the law
seeks to invest trust estates. *Ex parte Kingston*, L. R. 6
Chan. Appeals, 639; *Wormley* v. *Wormley*, 3 Wheat., 421.
Further—on the 1st of October, 1874, Pitkin drew on his
private account, and so out of the trust fund carried to its
credit, a check of $3,745, in payment of a private debt.
This mischief was the first fruit of the action of the bank in
placing it to Pitkin's credit. And on the 8th of October,
1874, Pitkin drew a check for $7,321.87 on his private
account in favor of himself as treasurer, and placed it imme-
diately to his credit as treasurer on the books of the bank.
And thus the bank saw the residue of the trust fund, even
to the last penny, transferred to the treasurer's account and
misappropriated. So much the bank knew for a certainty.
It also knew another thing most pertinent to the point in
hand, namely, that the loan was obtained on a pretence of
paying off some legacies under the will, and that, instead of
doing this, the executor was diverting the bulk of the trust
fund from the uses of the estate to his own credit as town
treasurer. The allowance of this transfer was a consent by the
bank to the executor's fraud. *Bodenham* v. *Hoskyns*, 2 De G.,
M. & G., 903. Between November, 1872, and October, 1873,
a period of eleven months only, he had drawn no less than
eleven checks, amounting to $11,332.28, on his treasurer's
account, all to himself as bearer, and all, in point of fact,
for his own private use. And it was to recruit this treas-
urer's account, thus depleted, apparently to his own private
use with the knowledge of the bank, that $7,321.87 of the
trust fund was used. It needs to be added that Pitkin at
this time was $7,321.87 in default to the town of East Hart-
ford. This very $7,321.87 of trust money concealed in his
private account with the knowledge of the bank, was drawn
and transferred by him to cover this very defalcation. The
bank did not know, nor trouble itself to learn, of this defal-
cation, but it did know that this was the time appointed by
law for annual town meetings and for the auditing of treas-

urer's accounts. And it had, moreover, good reason to suspect that Pitkin had before drawn on his treasurer's account, as he was now drawing on these trust moneys, for his own private use. The evidence of it had passed under the eyes of the bank, and was in its files and on its books.

2. From the foregoing premises we deduce the conclusion that the bank, after the making of the loan, and before the renewals of the same, had knowledge of the fraudulent purpose of the executor, and of the fraudulent misappropriation of the trust fund ; or, if it had no such knowledge in an actual sense, we claim that it had good reason to suspect fraud and was put on inquiry by the very nature of the transactions, and therefore is to be taken in law to have had actual knowledge. In other words, its ignorance was voluntary or the result of inexcusable negligence. The bank is to be taken in law to have known at the time of the several renewals of the $10,000 loan—(1) that the proceeds of the original loan were trust funds ; (2) that these trust funds had been deposited in the executor's private account ; (3) that $7,321.87 of these trust funds had been misapplied by the executor in fraud of the trust. The rule of law in regard to constructive knowledge is well stated as follows :— " The general rule is that notice of a fact to an agent is notice to the principal, if the agent has knowledge of it while he is acting for the principal in the course of the transaction which is in question. And this rule is applicable equally to corporations and natural persons." *Smith* v. *Ayer*, 101 U. S. R., 320. In the application of this rule, we submit—(1) That the president of the bank knew that the loan was intended for the uses of the estate, and if not so intended, that it would have been an embezzlement of trust funds. His knowledge of this fact became at once the knowledge of the bank, not because he was president, but simply because he was its agent in respect to the loan.—(2) The proceeds of the note, without being first received by the executor or in any way taken from the custody of the bank, were by the teller of the bank acting as its officer and agent, placed in the execu-

tor's private account, and constituted nearly the whole of that account. The teller's knowledge of this became also the knowledge of the bank, and this simply because he was the agent of the bank in respect to the transfer and disposition of the fund on its books.—(3) The teller knew that $7,321.87 of this trust fund standing in the executor's private account, by his own act was taken out of that account on the executor's check and credited directly to his account as treasurer. The teller himself received the check and paid it by charging the amount to his private and crediting it to the treasurer's account. The knowledge of all this, and of all entries made on the books in respect thereto, are imputable to the bank on the rule and for the reason before stated. *Farmers & Mechanics' Bank v. Butchers & Drovers' Bank,* 16 N. York, 125, 130.—(4) It is morally impossible that all the principal officers of the bank—whatever they may have not known originally—should not have subsequently come to know all the facts before mentioned, or at least have been put on inquiry in respect thereto. For the case finds that the loan had been under their manipulation, passed and repassed through their books, and been taken up and renewed every four months for a period of nearly four years. They must all have discovered, the teller himself included, and even the bookkeeper, that the loan represented in the beginning, and from the beginning, a trust estate ; for on the third renewal it was carried to and thereafter continued in the executor's official account until the end. On seven successive renewals it was charged and credited to this account. For seven successive renewals checks were drawn on the trust account in payment of the interest on these renewals, and paid to the teller out of that account. With all this knowledge on the part of the agents of the bank, how can it be heard to say that, when the last loan was made, they were not only ignorant, but had learned nothing in the whole course and history of the executor's dealings with their officers which was calculated to put them on inquiry ? If the bank knew, in fact, before making the renewals, or is to be taken in law to have known, that the proceeds of the first

loan, or any considerable portion thereof, had been applied by the executor to his treasurer's account, this fact alone was sufficient to put the bank on inquiry before venturing on this long line of renewed loans. Each renewal was a new loan on a new contract and a new consideration. Perry on Trusts, § 225; *Smith* v. *Ayer*, 101 U. S. R., 327; *McLeod* v. *Drummond*, 17 Ves., 170. The extraordinary length of the credits sought and given was of itself sufficient to excite suspicion and put the bank sharply on inquiry. It is to be noted here—(1) that the original loan was made for the mere temporary purposes of administration, and to a trustee, temporary by the very nature of his office; (2) that the original four months' credit had been already eight times renewed, and the executor was now at the end of three and a half years seeking and obtaining a ninth renewal. An administration is ordinarily wound up in one year. Why did not the bank before making the last renewal pause a moment for inquiry? *Duncan* v. *Jaudon*, 15 Wall., 176; *Stronghill* v. *Anstey*, 1 DeG., M. & G., 635.

3. Treating now the executor as an embezzler, and the original loan as an embezzlement on his part, and the bank as having subsequently acquired knowledge, or means of knowledge, of the uses to which the trustee had applied the proceeds of that loan, the collaterals pledged by the executor came thereby into a condition of equitable suretyship to the bank for the payment of the original debt as between the estate and the bank, and only for the original debt. 3 Leading Cases in Eq., 856. Though the suretyship were not known in the origin of the transaction, yet knowledge of it subsequently acquired will oblige the creditor to recognize thereafter the rights of suretyship as fully as if the surety had contracted as surety. *Oriental Corp.* v. *Overend*, L. R., 7 Ch. App., 142; Perry on Trusts, § 221; Hill on Trustees, 165. It follows, then, that if the assets of the estate were thus placed in suretyship for the original loan contracted by the executor for his private use, the law of suretyship attached to the transaction as between the estate and the bank; and

if the law of suretyship attached, then the collaterals stood only for the original note; and the bank by its subsequent renewals of the original loan after it had acquired knowledge of the misappropriation of the trust fund, discharged the collaterals from the obligation of suretyship. *Neimcewicz* v. *Gahn*, 3 Paige, 642; *Neimcewicz* v. *Gahn*, 11 Wend., 316; *Ayres* v. *Husted*, 15 Conn., 504; *Johns* v. *Reardon*, 11 Md., 465; *Smith* v. *Townsend*, 25 N. York, 479; *Bank* v. *Burns*, 46 id., 170.

*J. Halsey* and *L. E. Stanton*, for the respondent.

1. In the years 1872 and 1873 Pitkin had reduced his treasurer's account by about $7,300,—but there was no deficit in the account. He had not overdrawn it. This reduction was made by eleven checks, every one of which was signed as treasurer. The bank is bound to pay the drawer's checks if it has funds when the check is presented, and is liable in damages for a refusal so to pay. Morse on Banks, 249, 453, 454; *Munn* v. *Burch*, 25 Ill., 35; *Downes* v. *Phœnix Bank*, 6 Hill, 297; *Marzetti* v. *Williams*, 1 Barn. & Ad., 415; *Whitaker* v. *Bank of England*, 6 C. & P., 700; *Watts* v. *Christie*, 11 Beav., 546. On March 18th, 1872, he had drawn $3,200 from individual account and placed it in his treasurer's account. In 1873 by two of the above eleven checks, signed as treasurer, and by his directions to the teller, he returned $3,200 to the individual account. In this certainly there was nothing to notify the bank of any wrong. If he needed this $3,200 to pay town bills he could take his own money to do it and repay himself when town funds should come into his hands. The remaining nine of the above eleven checks were not credited over to any account in the bank—were payable to bearer, and the bank was bound to pay them on presentment. We submit that there was nothing to notify the bank of the slightest irregularity in any one of these eleven checks.

2. Next in order of time comes our loan of September 29th, 1874, of $10,000 to Pitkin as executor, and the pledge to us of the collateral. This loan was made upon his repre-

sentation that the same was needed for purposes of the estate. The loan was made in good faith and it and the pledge were lawful. An executor has power to sell and give good title to the personal estate and to borrow money for purposes of the estate, and to pledge its assets for security. Perry on Trusts, § 809; *Keane* v. *Robarts*, 4 Madd. Ch., 357; *McLeod* v. *Drummond*, 17 Vesey, 154; *Nugent* v. *Gifford*, 1 Atk., 463; *Meade* v. *Orrery*, 3 Atk., 235; *Whale* v. *Booth*, 4 T. R., 625; *Field* v. *Schieffelin*, 7 Johns. Ch., 150; 3 Redfield on Wills, 227; *Hough* v. *Bailey*, 32 Conn., 288; Hill on Trustees, 166; *Leitch* v. *Wells*, 48 N. York, 595.

3. If the loan was lawful we were not bound to see to the application of the money. *Farhall* v. *Farhall*, L. Rep. 7 Eq., 286; 3 Redfield on Wills, 232. The relation of banker and depositor is that of debtor and creditor, and the depositor may direct to what account his money shall be credited. *Farley* v. *Turner*, 26 Law Jour. Eq., 710. The true principle is that the lender is not responsible unless he has knowledge of the fraud. *Hough* v. *Bailey*, 32 Conn., 288. But if the title is not affected by an unknown fraud of the administrator in the sale itself, much less could the title be impaired by the fact that the administrator should afterwards waste the money which was the price of the note.

4. It is urged against us that the bank permitted him to place this discount upon the individual account and thus facilitated the fraud, but this is not true in point of fact. The bank was no party to that fraudulent act, if it was a fraud. It was his act. He had in his hands so much money. He could do what he chose with it. He could have procured bills and have deposited them in our bank or in any other. He could have distributed them among his three accounts in the respondent bank. That the respondent would have been compelled to pay his checks against these funds in whatever account deposited is too clear for dispute. In *Manhattan Co.* v. *Lydig*, 4 Johns., 377, a depositor did not hand his funds to the teller, but sent them in by a book-keeper of a bank. The bookkeeper purloined them. Held that the bookkeeper was not agent of the bank and the

bank not liable. Again, the deposit of the proceeds of the
$10,000 note in the individual account *did not aid the fraud.*
If they had been put in the executor's account he could by
executor's checks have devoted every dollar to his private
uses.   The transfer of $7,321.67 from the individual account
to the treasurer's account was no fraud on the part of the
bank.   We had no knowledge that the treasurer's account
had been improperly reduced.   Pitkin could by checks on
each account have drawn out in money all the deposits from
all three accounts, and could afterward have put it all back
into any account designated by any title. he should select.
*Backhouse* v. *Charlton*, L. R., 8 Ch. Div., 444; *Ex parte
Kingston*, 6 L. R., Ch. App., 639.   We have renewed the
$10,000 note from time to time.   The third and later
renewals were credited, by his directions to the teller, to his
executor's account, and thereafter discounts were paid from
that account.   Upon this account there was already a bal-
ance of $1,260.66.   This entire executor account he since
that date drew down, of course by executor's checks, and
finally overdrew it, and owes us $749.98 upon it.   We have
paid the whole amount therefore of this note on executor's
checks.   We hold executor's vouchers for the whole.   If the
petitioner complains of the renewal of the note we answer
that he does not show damage to the estate by such renewal.
Had we refused to renew, then Pitkin could have caused the
collaterals to be sold to pay it.

5. The court directly finds that the bank officers except
the teller had no knowledge of these checks and deposits.
It is, however, urged that we had constructive notice of the
wrong, that slight circumstances are enough to charge with
notice one dealing with an executor, and that an inquiry by
us would have notified us of the wrong.   It will perhaps be
said that we had constructive knowledge of the deposit with
the teller, and, as that deposit appears on the books, the
bank is to be taken to know the fact of the deposit to indi-
vidual account, whether the president, cashier or other
officers knew it or not.   But the cases do not go to this

extent. A teller is an officer to receive and pay out money. He is the agent of the depositor. The president and cashier are not bound to know everything which a teller or clerk knows. Notice to him is only notice of the precise thing about which he is employed. Notice to a director, clerk, teller or notary of a bank is not notice *at all* unless he is employed in bank business, and then only of matters as to which he represents the principal. *Manhattan Co.* v. *Lydig,* 4 Johns., 377; *Custer* v. *Bank,* 9 Penn. St., 27. Knowledge of a clerk is not knowledge of the bank. *Goodloe* v. *Godley,* 13 Sm. & Marsh., 233; *State* v. *Bank,* 6 id., 218; *Washington Bank* v. *Lewis,* 22 Pick., 24; *Fulton Bank* v. *Canal Co.,* 4 Paige, 127; *Clark* v. *Bank,* 3 Duer, 241; *Mussey* v. *Bank,* 9 Met., 306. In an action on a cashier's bond it was held that the cashier was not bound to inspect all entries and detect frauds of the teller. *Batchelor* v. *Planters' Bank,* 10 Reporter, 16. A bank held not liable for negligence of its notary. *Warren Bank* v. *Suffolk Bank,* 10 Cush., 582. The teller knew only the precise thing shown to him, namely, that Pitkin had deposited so much money. He did not know that it was the proceeds of an executor's note, nor was it his business to inquire from what note it was derived, nor to inform the president or cashier of the fact of the deposit. *Weisser* v. *Denison,* 6 Seld., 68. Mere notice to a director is no notice to a bank. *Farmers' Bank* v. *Payne,* 25 Conn., 444. The deposit of this money upon individual account was not calculated to arouse suspicion of fraud. The legatees had no suspicion of the executor's frauds till after his flight in 1878. Then, and not before, they complained that we had the same confidence in Pitkin which they had. Bankers are not responsible in such cases unless they are parties to the fraud. *Keane* v. *Robarts,* 4 Madd, Ch., 332. Even if there were suspicion of fraud we were bound to pay his checks and could not set up a *jus tertii* as a defense. *Elliot* v. *Merryman,* 1 White & Tudor's Lead, Cases, part 1, p. 99.

6. A bank is not bound to supervise the separate accounts of the depositors nor to inquire into transfers from one to

another, when there is no suspicion of fraud. *Backhouse* v. *Charlton*, L. R. 8 Ch. Div., 444. The case of *Bodenham* v. *Hoskyns*, 2 De G., M. & G. 903, has no application to the present case. There the bankers misapplied the money themselves to their own uses. Morse on Banks, p. 41. A banker with whom trust funds are deposited is not a fiduciary. He is a debtor. *Foley* v. *Hill*, 2 H. L. Cases, 28; *Bailey* v. *Finch*, L. R., 7 Q. B., 34; *In re Agra & Masterman's Bank*, 36 L. J., Ch., 151; *Pennell* v. *Deffell*, 4 De G., M. & G., 372; *Ex parte Kingston*, L. R., 6 Ch. App., 632. It was competent to show that according to the usage of the bank the president and cashier do not inspect every entry of the teller. It repels the imputation of negligence or implied knowledge of fraud. *Warren Bank* v. *Suffolk Bank*, 10 Cush., 582; *Chicopee Bank* v. *Eager*, 9 Met., 583; *Bank* v. *Page*, 9 Mass., 155; *Batchelor* v. *Bank*, 10 Reporter, 16. Pitkin was one of three hundred or more depositors in a large banking-house. It was not negligence that these transactions did not attract the attention of the officers. It would put an end to the business of a bank to require such a degree of watchfulness of it.

PARDEE, J. (After stating the principal facts). The petitioner insists that, inasmuch as the acts of the executor in depositing on his private account the amount of the $10,000 loan made upon his note as executor and in drawing the checks which he did upon that account, were known to the teller of the respondent bank and were recorded upon its books, the directors are to be charged with having thereby acquired actual knowledge of a fraudulent use of the money by the executor after the loan and before the first renewal thereof; if not actual knowledge such good reason for suspicion as to put them on inquiry; that the ignorance was voluntary or the result of inexcusable negligence; and that the renewal under such circumstances released the pledged asset in behalf of the legatees.

When the executor applied to the respondent for a loan, saying that it would be for the benefit of those interested in

the residue of the estate, of whom he was one, to pay the legacies at once by borrowing, pledging the shares in question as security, and holding them for a more favorable condition of the market, the declared purpose was within the power vested in him by the will, was one which the strictest law of trusts would sanction, and one for which the respondent, acting in good faith, could safely make and renew a loan upon the security of the shares. In doing this it came under no obligation to see to the proper application of the money; did not become the insurer of the estate against a devastavit. For the executor had power to borrow money for purposes connected with the discharge of his duties, and pledge the assets of the estate as security ; and the title of the pledgee will be perfect even if the executor intended a fraud, if the loan was made for a purpose apparently proper, without knowledge actual or implied of such intention.

The petitioner has called our attention to *Bodenham* v. *Hoskyns*, 2 DeG., M. & G., 903, in which a trustee deposited money with the defendants in the name of the *cestui que trust ;* they loaned money to him for his private uses, and induced him to repay them from the trust money ; to *Colt* v. *Lanier,* 9 Cowen, 342, in which an executor with the knowledge and consent of his partner, Colt, used the funds of the estate in payment of partnership debts ; to *Duncan* v. *Jaudon,* 15 Wall., 176, in which Duncan, to oblige Jaudon, loaned him money knowing it to be for his individual use and took in pledge shares which he knew belonged to an estate ; to *Smith* v. *Ayer,* 101 U. States Reps. 327, in which the defendant took in pledge from an executor assets which he knew belonged to the estate for a loan which he had made to the executor, knowing it to be for his private use; and to *McLeod* v. *Drummond,* 17 Vesey, 170, in which bankers took from an executor assets which they knew belonged to the estate as security for a loan which they made to him, knowing it to be for his private use.

In each of these cases the person compelled to surrender money paid, or assets pledged to or purchased by him, acquired from one known to him to be an executor or trustee,

that which he knew to be an asset of the estate or of the trust, with actual knowledge derived from the executor or trustee himself that he intended to use the proceeds of the sale or pledge for the relief of his private necessities; and, as a rule, in cases where the pledgee or purchaser had not knowledge from the declaration of the executor or trustee, we think that courts have not decreed a forfeiture of title unless he had actual knowledge of facts which of themselves afford as convincing evidence of the fraudulent intent as if the executor or trustee had made such declaration to him; as when a trustee, confessedly borrowing for his own use, offers in pledge a certificate of stock in his name *as trustee,* with a power to transfer executed by him *as trustee,* without any accompanying oral declaration that he had only the title of trustee to the shares; as was presumably the case of *Shaw* v. *Spencer,* 100 Mass., 382. The court compelled the pledgee in such a case to accept the declaration of the certificate as the equivalent of a declaration by the person. And, inasmuch as the act of loaning to an individual for his private use and knowingly requiring of him the delivery of trust shares by way of security, is regarded as fraudulent, in the sense that it is assistance intentionally given for profit to one who is perpetrating a fraud, courts are unwilling to decree a forfeiture for fraud upon knowledge imputed to the pledgee, unless the facts in which it is found force the imputed, in degree, close up to the actual; unless indeed, to borrow a rule of evidence, they exclude all reasonable doubt as to the existence of knowledge.

But in the case before us the respondent had not at the last renewal actual knowledge that the executor had not carried into effect his expressed purpose to apply the borrowed money to the payment of legatees.

Again, Pitkin became a debtor to the estate for the money which he as executor received from the respondent, and to the town for that which as treasurer he received from the tax-collector; all this money thereby became to such a degree his own, and was to such an extent at his sole disposal, subject to his uncontrolled decision as to the place and man-

ner of temporary keeping, that he could retain both in his personal possession without mark upon either, mingle them in one deposit, transfer the deposit from one account to the other for his convenience in keeping, investing or paying, without imposing upon the respondent an obligation because of these acts to know or suspect a fraud. Neither by such holding, or deposit, or transfer, is money lost to its own fund. It is not lost nor has a fraud been perpetrated so long as it remains in his possession or at his command, with an intent to answer all demands both of the estate and town ; and so long as possession and ability to answer continue in him the intent will be presumed to be united with them. And a check drawn either individually or officially, payable to order or bearer, is so nearly the equal of currency in case of transfer, and performs so many offices of payment between individuals and executors, between the latter and trustees, and between these again and individuals, without giving any evidence when presented either of the number or character of the transactions of which it has been made a part or of the payments which it has effected, that the law will not charge the officers of a bank with knowledge that a depositor has committed a fraud, nor impose upon them the duty of inquiry, because he has drawn upon a treasurer's account checks payable to himself or to bearer, or has transferred money from it to his own and from his own to it. They are not required to assume the hazard of correctly reading in each check the purpose of the drawer. The respondent directors might well suppose that the check for $3,745, drawn by Pitkin on October 1st, upon his individual account to order, effected in behalf of some of the legatees the reinvestment of their money in a form and manner known to and approved by them ; and that his openly recorded act on October 8th, transferring the remaining proceeds of the loan from his individual to his treasurer's account, accomplished in behalf of other legatees and in a form and manner known to and approved by them the sale of the stock and a re-investment of their money in the safer obligations of the town ; and, in short, that each of his checks as treasurer to

bearer, or to himself, or from himself to the treasurer, completed an honest transaction.

In *Central National Bank* v. *Connecticut Mutual Life Insurance Co.* (104 U. S. Reps., not yet published), A. H. Dillon, Jr., had deposited with the bank in his name as " General Agent " money which as such agent he had collected for the insurance company. Notwithstanding it had actual knowledge as to the ownership of the money, the bank charged to this account his note given for money which it had loaned to him knowing it to be for his individual use, and refused to honor his check drawn upon that account as " agent" in favor of the insurance company, the owner. In the opinion denying the right of the bank to the money the court says :—" A bank account, it is true, even when it is a trust fund and designated as such by being kept in the name of the depositor as trustee, differs from other trust funds which are permanently invested in the name of trustees for the purpose of being permanently held as such. For a bank account is made to be checked against, and represents a series of current transactions. The contract between the depositor and the bank is that the former will pay according to the checks of the latter, and when drawn in proper form the bank is bound to presume that the trustee is in course of lawfully performing his duty, and to honor them accordingly." And it is to be remembered that while we read the record of his deposits and checks in the clear light of fraud confessed by his flight, to the officers of the bank it was the record of the treasurer of his town ; of a man whose integrity no one had then presumed to question. It might be a wholesome rule, if established and understood, that any omission by a trustee of the mark of the trust from either the securities or the money belonging to it, even with an honest purpose and for the briefest time, should be notice to all persons having knowledge of such act, that a fraud had been accomplished, if thereby the fidelity of trustees could be secured ; but when a trustee has broken down all other barriers between himself and fraud, we fear that he will not allow a rule of law to restrain him ; those for whom he acts must ever find their protection in his integrity.

Nor will the law impute to the directors knowledge of fraud accomplished or intended from the fact that the executor desired to renew and continue the loan during the period of nearly four years. His reason for borrowing was that time would increase the value of the assets offered in pledge, and therefore it would be for the benefit of those to whom the residue was given, of whom he was one, to pledge and hold rather than sell. The reason embodied a promise to settle the estate at once by the payment of debts and legacies together, with a declaration that the loan would be projected into the future ; that the time taken for the settlement of the estate had nothing to do with the life of the loan; that that would depend solely upon the judgment of himself and others who, if debts and legacies were paid, were the owners of the pledged asset. And the reason referred to shares in a long-established and successful fire insurance company, which were not likely to increase in value suddenly because of unexpected profits. It is but reasonable to presume that the directors believed, as they had the right to do, that the only increase looked for was that which the general revival of the business and prosperity of the country would effect; that of necessity it was to be the result of the lapse of a considerable period of time. Therefore there was neither suggestion of danger nor ground for suspicion in the length of the loan ; and as from October, 1874, to October, 1878, the shares increased somewhat in value and paid large and regular dividends, the reason assigned by Pitkin continued to the last as complete a justification of the confidence of the directors in his truthfulness as at the first. They had the right to presume that debts and legacies had been paid, and that he was seeking to secure the profits of a rising market to himself and his associate remaindermen.

Moreover, we are unable to perceive that the granting of the loan was an added temptation to fraud. For to the executor determined to commit it, upon the same representation a sale was as easy for himself and as safe for the purchaser as would have been a pledge ; having the money he need make no deposit; he could pay it away for his private

use without speaking or written witness.    So long as he should continue to pay the income to the legatees they were as little likely to suspect, inquire, or be informed, in one case as in the other.

Consequently, neither in law nor equity can the estate transfer the wrong and loss resulting from the betrayal of his trust by the executor from itself to the respondent.

The Superior Court is advised to dismiss the bill. .

In this opinion the other judges concurred.