Hillsborough, }
  Oct. 3, 1905. }

## BROOKHOUSE *v.* UNION PUBLISHING CO.

The fact that a guardian made use of the money of his ward for his own purposes very soon after he withdrew it from a savings bank, and in making use of it pursued the course of his habit in the use of private funds,—depositing the money in the bank account of a corporation of which he was treasurer and immediately checking it out for his private purposes,—is competent evidence upon the question of his intention at the time of the withdrawal of the money from the savings bank.

If trust funds are deposited in the bank account of a corporation by the treasurer thereof and subsequently used for his private purposes, the company is not liable to the beneficial owner by reason of a mere temporary possession from which no substantial benefit was derived.

Where a corporate officer, who customarily utilizes the company's bank account for his private business, causes to be deposited therein drafts and certificates of deposit payable to and indorsed by himself as guardian, and subsequently misappropriates the money in pursuance of a preconceived scheme of fraud, the corporation is not liable therefor to the beneficial owner, on the ground that it received the funds with notice of the trust and aided in their wrongful diversion.

A principal is not chargeable with knowledge of his agent when the latter is engaged in the commission of an independent, fraudulent act upon his own account, to which the facts sought to be imputed relate.

BILL IN EQUITY, to recover sums of money with which it is alleged the defendants are chargeable as trustees for the plaintiff. The facts were partly agreed to and partly found by the court. Transferred from the May term, 1904, of the superior court by *Pike*, J.

From a date prior to May, 1895, to October, 1895, Joseph C. Moore was the defendants' treasurer and manager, and had the practical control of their affairs. From February, 1894, to October, 1895, they also had an assistant treasurer, whose powers and duties were the same as those of the treasurer in case of the latter's absence or disability, excepting authority to sign certificates of stock. The defendants had a deposit account with the Manchester National Bank. Moore used this account as a conduit for his private enterprises, keeping a record thereof upon the defendants' books.

Moore was also guardian of the plaintiff, then a minor, and had deposited in a savings bank, in his name as guardian, sums of money belonging to the plaintiff. May 23, 1895, he withdrew from this bank $2,250, receiving a certificate of deposit and a draft upon a Boston bank, both payable to himself as guardian, or order. He indorsed these papers as guardian and passed them to the defendants' assistant treasurer, to be deposited in the Manchester National Bank to the defendants' credit. The assistant treasurer indorsed the defendants' name upon the papers and deposited them the same day, in accordance with Moore's instructions. An entry was made by Moore's direction upon the defendants' cash book, by which cash was charged with $2,250, as if received from him. May 24, Moore drew two checks, in the defendants' name, in favor of the Halifax Mills, upon the Manchester National Bank, amounting to $2,250, neither of which was for the defendants' benefit. The checks were paid by the bank and charged to the defendants on May 29. Upon each of the days intervening between May 24 and May 29, sums of money amounting to $3,000 or $4,000 were deposited in the National Bank in the defendants' name, and sums amounting substantially to the same totals were withdrawn, leaving the balance at the close of business each day less than $30. Nearly all the sums deposited were Moore's; and the sums withdrawn were used in part to pay his bills and in part to pay the defendants' bills.

August 21, 1895, a further sum of $1,250 was withdrawn from the plaintiff's savings-bank account in the form of a certificate of

deposit, put in the defendants' account at the National Bank, and entered upon the defendants' cash book, the same in all respects as the first sum. When the deposit in the National Bank was made, the defendants' balance there was only $20. Other sums belonging to Moore were deposited with the $1,250, making the total deposit $8,065. The defendants' cash book of August 21 shows the receipt of these sums from Moore and the payment of sums on his account amounting to $6,579. The account of the next day's transactions shows the receipt of $6,300 from Moore and the payment of $6,788 on his account. August 21, he drew a check for $820 to pay the defendants' help, and also drew other checks. The defendants' check book showed that there would be a balance of $2,313.26 in the bank to the defendants' credit after satisfying these checks.

When Moore withdrew the money from the savings bank, it was his intention to deposit it in the defendants' account with the National Bank for the purpose of checking it out for the benefit of others than the defendants, and he carried the intention into effect. The finding as to intention is made from the manner in which the transactions themselves took place and from Moore's habit for years of using the defendants' account with the National Bank for his private business. The plaintiff excepted to this finding. From May to October, 1895, Moore was indebted to the defendants in a sum exceeding $3,500.

The question whether the plaintiff—now twenty-one years old —is entitled to recover the sums withdrawn from the savings bank, or either of them, was reserved.

*Taggart, Tuttle, Burroughs & Wyman*, for the plaintiff.

*Burnham, Brown, Jones & Warren*, for the defendants.

CHASE, J. The fact that Moore made use of the money in question for his own purposes very soon after he withdrew it from the savings bank, and that in using it he pursued the course of his habit in the use of private funds,—depositing the money in the National Bank in the defendants' name and immediately checking it out for his private purposes,—was competent evidence upon the question of his intention at the time of the withdrawals. As this evidence has a tendency to support the court's finding, the plaintiff's exception to the finding must be overruled; and the finding must be accepted as true in considering the questions of law raised by the case.

The plaintiff is entitled to the relief sought (1) if the defendants now have possession of the money in question; or (2) if they

received it from Moore with notice of the trust and applied it to the payment of Moore's individual indebtedness to them ; or (2) if they so received it and aided Moore in wrongfully diverting it from the plaintiff. *Hill* v. *McIntire*, 39 N. H. 410 ; *Sherburne* v. *Goodwin*, 44 N. H. 271 ; *French* v. *Currier*, 47 N. H. 88 ; *Hardy* v. *Bank*, 61 N. H. 34.

The first (1) ground of relief certainly does not exist. The fund was traced, not into the defendants' possession merely, but through their possession into the possession of other parties. *Bank Commissioners* v. *Trust Co.*, 70 N. H. 536, 544, *et seq.*

Nor is the second (2) ground of relief established. The money was not paid and received on account of Moore's indebtedness to the defendants, but in the use by Moore of the defendants' deposit account with the Manchester National Bank as a " conduit " for, or means of, transmitting money in his private enterprises. If the defendants had any use whatever of the money, which is doubtful, it was only as an incident of the deposit, during the brief time while the money was passing through their deposit account with the National Bank, and with no intention on the part of Moore, or on their part so far as appears, to permanently convert the money to their uses. There was no such conversion of the money as will justify a court of equity in holding the defendants responsible for it as trustees for the plaintiff.

The question remains (3) whether the defendants received the money with notice of the trust, and aided Moore in wrongfully diverting it from the plaintiff. In considering this question, the matter of notice is of vital importance. The defendants took no part whatever in withdrawing the money from the savings bank. That was solely Moore's act; and being accompanied with the intention of using the money for his own purposes, constituted a complete conversion of it. He had already converted the money to his own uses when he handed the certificates of deposit and the Boston draft, duly indorsed by him as guardian, to the defendants' assistant treasurer, with directions to deposit the same in the defendants' bank account. To consummate his fraudulent scheme, he deemed it convenient or advisable to use that account as a " conduit " through which to pass the money from himself to the parties to whom he might pay it. The only persons who took part in operating, so to speak, the " conduit " were Moore himself and the defendants' assistant treasurer. No other officer or servant of the defendants did anything whatever in respect to the deposit or withdrawal of the money. The entries upon the defendants' books relating to the money were in Moore's name. An officer or agent of the defendants, however attentive to his duties, would not learn from an examination of the books that the plain-

tiff's money was passing through their bank account, nor dis-, cover facts that would put him upon inquiry in that direction. The defendants' assistant treasurer received no direct information as to Moore's fraudulent intention. His only knowledge relating to the transactions was that the certificates of deposit and draft were payable to Moore as guardian or order, were indorsed by him in that capacity, and were deposited with the defendants as if they were his private funds. In considering these facts it must be borne in mind that the certificates and draft, unlike certificates of stock in corporations or promissory notes, were mere temporary representatives of value or credits. They did not bear interest. They were negotiable paper according to the commercial law. 2 Dan. Neg. Inst., *ss.* 1652, 1703, 1705. In the ordinary course of business, such paper is used like currency to pass money from one person to another in business transactions—not to represent money more or less permanently invested with a view of producing income. Decisions relating to the transfer by trustees of stock certificates, promissory notes, and similar papers afford little aid in a case of this kind. Circumstances that would conclusively show that a transfer of certificates of stock, etc., was in violation of the trust might be entirely consistent with a lawful transfer of certificates of deposit and drafts. To a person not informed of the circumstances by which Moore obtained these papers and of his intention in respect to their use, it would appear that he had a right to negotiate them as he did in this case. Indeed, if they did not lawfully belong to him individually in consequence of his past transactions in executing the trust, it would be his duty to make use of them in paying outstanding claims against the trust estate, if any, or in making investments, or in some other way for the benefit of his ward. To hold them an unreasonable length of time would be a breach of trust, and would subject him to liability for any loss arising therefrom. By reason of his position as guardian and the form of the papers, he had absolute control of the manner in which they should be used. No license from the probate court, or other source was necessary. He could transfer them directly to the persons to whom he intended ultimately to pay the money represented by them, or he could convert them into currency and use that, or he could deposit them in a bank in his name as guardian, or in his own name without further description, and draw checks against the deposit. If he transferred them directly to a person in payment of his private indebtedness, or for some other consideration known to be for his private benefit, the form of the paper alone would be sufficient to put the person upon inquiry as to his right to so use the paper, and to charge him with knowledge of the facts he would thus learn. Such use is generally wholly

inconsistent with the guardian's rights, and is not made in the ordinary course of business. But the indorsee of such papers who receives them in the course of changing them into currency, or in the course of distributing the credits they represent by means of a temporary deposit and checks or orders drawn against the deposit, is not put upon inquiry by the mere form of the paper; for such use is consistent with the guardian's rights and duty. To charge such indorsee with responsibility for a misapplication of the funds, it must appear that he had knowledge of the contemplated misapplication, or of facts that would put him upon inquiry. Even a mingling of guardianship funds with private funds in a deposit account with a bank kept in the guardian's individual name is not, in itself, unlawful, though it be unwise. In such case the form of the paper will not impose upon the bank the duty of seeing to it that the guardianship portion of the account is properly used. The ordinary presumption applies—that the guardian is acting in good faith, and will make a proper use of the money in drawing checks against the deposit. See *Sherburne* v. *Goodwin*, 44 N. H. 271, 279. The only obligation of the bank is to honor the checks that are duly drawn against the account in the form it is kept. To charge banks with the duty of supervising the administration of trusts, when in the due course of business they receive checks and drafts payable to and properly indorsed by trustees in their trust capacity, would place an unreasonable burden upon the banks and seriously interfere with commercial transactions. The law imposes no such duty upon banks. *Bank Commissioners* v. *Trust Co.*, 70 N. H. 536, 550, 551; *Goodwin* v. *Bank*, 48 Conn. 550; *Board of Freeholders* v. *Bank*, 48. N. J. Eq. 51; *State Nat'l Bank* v. *Reilly*, 124 Ill. 464; *Coleman* v. *Bank*, 94 Tex. 605; *Interstate Nat'l Bank* v. *Claxton*, 97 Tex. 569; *Nat'l Bank* v. *Insurance Co.*, 104 U. S. 54, 63; *Gray* v. *Johnston*, L. R. 3 Eng. & Ir. App. Cas. 1; 2 Dan. Neg. Inst., s. 1612. It is true that the defendants are not bankers, but their obligation to Moore in respect to funds which he placed in their bank account, or in their possession to be there deposited, was like that of a bank to its depositor. It is not questioned that he had the defendants' license to use the account. If the authority was not expressly given, it must have arisen from the practice which had existed for years, presumably with the defendants' knowledge and acquiescence. This authority, together with Moore's official relation to the defendants, enabled him to make use of the account for his private purposes as fully and conveniently as he could have done if the account in the bank had been in his own name. He could make deposits and check them out at will by his own act. He could use the account for a lawful transmission of guardian-

ship funds, the same as he could if the deposit had been made in the bank in his own name.   When the defendants' assistant treasurer received, indorsed, and deposited the certificates and draft,. he might properly presume that Moore would withdraw the funds. so deposited for lawful purposes.   It does not appear that the assistant treasurer had knowledge of any facts that had a tendency to overcome this presumption.   If he was acting within his authority as assistant treasurer, which—Moore being present and acting—is. doubtful, the defendants are not chargeable through him with knowledge of Moore's contemplated misappropriation of the funds,. or of facts that would put them upon inquiry in regard to the matter.

The plaintiff further says that the defendants had notice of the fraud through Moore himself, their treasurer and general manager.   It is true that a principal is ordinarily chargeable with the knowledge acquired by his agent in executing the agency, and is. subject to the liabilities which such knowledge imposes.   But . there is a well established exception to this rule, by which the principal is not charged with the knowledge of his agent when the latter is engaged in "committing an independent, fraudulent act on his own account, and the facts to be imputed relate to this fraudulent act."   *Allen* v. *Railroad,* 150 Mass. 200; *Indian Head Nat'l Bank* v. *Clark,* 166 Mass. 27; *Produce etc. Co.* v. *Bieberbach,* 176 Mass. 577, 588; *Camden etc. Co.* v. *Lord,* 67 N. J. Eq.. 489,—58 Atl. Rep. 607; *Gunster* v. *Company,* 181 Pa. St. 327; *Frenkel* v. *Hudson,* 82 Ala. 158; *American Surety Co.* v. *Pauly,* 170 U. S. 133; 2 Pom. Eq. Jur. (3d ed.), s. 675, and authorities. cited in notes; 1 Am. & Eng. Enc. Law (2d ed.) 1145, and authorities cited in notes.   This exception was recognized in this state in *Clark* v. *Marshall,* 62 N. H. 498, 500.   Mr. Pomeroy suggests a doubt whether it applies to the managing officers of a corporation "through whom alone the corporation can act."   Sect. 675,. note 1.   He gives no reason for the doubt, and the cases which seem to have raised it—*Holden* v. *Bank,* 72 N. Y. 286, and *First Nat'l Bank* v. *New Milford,* 36 Conn. 93—were decided upon an application of the general rule to the facts, without any allusion to the exception, and of course without any allusion to a distinction in the application of the exception when the principal is a corporation instead of a natural person.   In both cases the principals were seeking to hold an advantage acquired through the fraudulent acts of their agents, and were chargeable with the fraud by virtue of the familiar principle, that a person cannot ratify acts and disaffirm the fraud that is a constituent part of them.   In the case at bar, the defendants do not set up any claim to the funds in dispute.   The funds have passed beyond their .

reach without being of any advantage to them. In many of the cases cited, the principals were corporations which acted solely through the officers who committed the fraud. Whatever be the true reason for the exception,—whether it be the presumption that the agent would not communicate knowledge of his fraud to his principal, or the consideration that the fraudulent acts are not within the scope of the agent's employment and are wholly for his benefit,—it is not perceived how the fact that the principal is a corporation instead of a natural person affects the application and force of the reason. The knowledge of a corporation, whether actual or imputed, must necessarily be that of its officers; but this circumstance does not transform the officers into principals. The stockholders of a corporation like that of the defendants furnish the capital and presumably carry on its business. The principalship of the corporation is embodied in them. The officers and agents of the corporation exercise only delegated authority—delegated by virtue of their election to office under the law of the state, or by virtue of a by-law or rule of the corporation, or by virtue of its habitual manner of doing business. If, as the plaintiff argues, the assistant treasurer represented the defendants in the receipt of the deposits, Moore was not the only officer of the corporation through whom the corporation could act relating to the matter. The facts would not admit of the application of the rule to which Mr. Pomeroy's doubt relates.

The application of the rule embodied in the exception to the peculiar circumstances of this case produces a just result—one that commands the approval of a court of equity. The defendants were not really the principals of Moore in respect to the deposits and withdrawals of the plaintiff's money in and from their bank account; they were his agents. The transactions were solely on his account and for his benefit. The defendants received no substantial benefit from them. The only authority conferred upon Moore by them which he used was the authority to use their bank account for his private purposes. In drawing checks, he fulfilled their obligation to himself. He was really acting for himself. If he had drawn the checks in the course of a legal use of the funds, the plaintiff would have had no cause for complaint. As has been seen, the defendants did not owe the plaintiff the duty of looking after the appropriation of her money, even if they knew it was temporarily in their possession. The presumption was that he would lawfully appropriate it. There is no evidence outside of that relating to Moore's acts and intention in these particular transactions which tends to show that they had reason to anticipate he would attempt to use the authority they conferred upon him in misappropriating trust funds. They were, at most,

only unwitting agents of Moore in the transactions. The mere fact that he acted for the defendants in fulfilling their obligation to him does not in justice and equity afford a sufficient reason for charging them with knowledge and making them responsible equally with himself for a fraud that he was committing outside the scope of the authority he exercised in their behalf.

Still another position taken by the plaintiff is that she might maintain an action against the Manchester National Bank, on the ground that the form of the certificates of deposit and draft was notice to the bank that the papers represented guardianship funds, to which the defendants could not give a valid title; that if the plaintiff pursued that course, the bank would have a right of action against the defendants upon their indorsements of the paper; and that equity will enable the plaintiff to proceed directly. against the defendants in the interest of the bank as well as herself, thereby avoiding the necessity of two actions. It follows from what has already been said that this position is not tenable, even if equity would have jurisdiction of the subject-matter in case the bank acquired no valid title to the paper—a point that has not been considered.

The plaintiff is not entitled to the relief sought, and the bill should be dismissed.

_Exception overruled: case discharged._

BINGHAM, J., did not sit: the others concurred.