STATE ex rel. CLARKE, Superintendent of Banks, v. RIPLEY SAV. BANK & TRUST CO.—160 S. W. (2d), 189.

Western Section.    December 13, 1941.

Petition for Certiorari denied by Supreme Court, February 28, 1942.

W. N. McKinney and J. D. Mosby, both of Nashville, for appellant Ripley Land Co.

Steele & Steele, of Ripley (James E. Markham and Carl A. Landis, both of Washington, D. C., of counsel), for H. B. Clarke and Federal Deposit Insurance Corporation.

KETCHUM, J. This is an appeal by the Ripley Land Company from a decree dismissing its intervening petition filed against the receiver of the Ripley Savings Bank & Trust Company and the FDIC in the suit of R. B. Clarke, superintendent of banks, against the Ripley Savings Bank & Trust Company for the liquidation of the assets of said bank as an insolvent institution.

The said Ripley Savings Bank & Trust Company had been engaged in a general banking business in the town of Ripley for thirty-six years prior to its failure which occurred on April 24, 1939; and the Ripley Land Company, a corporation engaged in farming operations, had been a depositor·in said bank for many years prior to its failure.

G. M. Partee was first cashier and later president of said bank from the time of its organization and was its chief executive officer. He was also secretary and treasurer and the manager of the Ripley Land Company and had general charge of its business operations and had authority to draw checks on its bank account for ordinary business purposes, but not for his personal use.

The Federal Deposit Insurance Corporation, referred to as the FDIC, was made a defendant to the petition by reason of a contract it had with the Ripley Savings Bank insuring its deposits in accordance with the provisions of the Act of Congress of August 23, 1935. 12 U. S. C. A., sec. 264.

The petitioner's claim is based upon five checks drawn by the said G. M. Partee on the account of the Ripley Land Company, amounting in all to $2,700, and paid by the bank and charged to the Land Company's account. The first four checks aggregating $1,700, were all handled by Mr. Partee without the assistance or knowledge of any other officer or representative of the bank and will be considered together in one group. The fifth check, for $1,000, was drawn under different circumstances, and the president, cashier and assistant cashier all participated in the transaction, and this check will be discussed separately.

The four checks were all drawn by Partee on the account of the Ripley Land Company and charged to its account and the proceeds thereof were appropriated by Partee for his own use, and are described as follows:

(1) A check for $300, dated July 24, 1937, payable to Partee, or bearer, signed by the Ripley Land Company and endorsed by G. M. Partee.

(2) A check for $600 of date December 29, 1937, payable to G. M. Partee, or bearer, and having no endorsement.

(3) A check for $500 of date March 8, 1938, payable to Partee & Miller or bearer and having no endorsement.

(4) A check for $300 of date December 31, 1938, payable to G. M. Partee, or bearer, and having no endorsement thereon.

The proceeds of these four checks, aggregating $1,700, were appropriated by Partee to his own use, and no other officer of either the Land Company or the Bank had any part in the transaction or any knowledge of any irregularity therein. Mr. Partee in his deposition admits that he had no authority to draw the checks for his personal use, that he converted the money to his own use, that the transactions were handled by himself alone, as the representative of the bank, and that no other officer or agent of the bank had any part therein.

██ Under these facts, which are not disputed, we think the case is controlled by the ruling of Smith v. Mercantile Bank, 132 Tenn., 147, 150, 177 S. W., 72, and that class of cases which hold that the knowledge possessed by the agent, although acting in his own private interest, will be imputed to his principal, where the agent is the sole representative of the corporation in the transaction. See People's Bank & Trust Co. v. Potter, 156 Tenn., 649, 653, 4 S. W. (2d), 341; Barry v. Hensley, Adm'r, 170 Tenn., 598, 604, 98 S. W. (2d), 102; 2 Am. Jur., "Agency," sec. 380, page 300; Brookhouse v. Union Publishing Co., 73 N. H., 368, 62 A., 219, 2 L. R. A. (N. S.), 994, 111 Am. St. Rep., 623, 6 Ann. Cas., 675.

In First National Bank v. Burns, 88 Ohio St. 434, 103 N. E., 93, 95, 49 L. R. A. (N. S.), 764, 769, the Supreme Court of Ohio, in a well considered opinion, say that there is no need of the agent's communicating the knowledge he has to his principal in such cases, because the principal, in law, is already conclusively presumed to have that knowledge; and the court say:

"The principal's liability does not depend upon the agent's duty to communicate, or the likelihood that he will communicate, his knowledge to the principal, but upon the fact that the agent is the alter ego of the principal, acting for the principal, and knows that his acts and knowledge ipso facto become the knowledge and acts of the principal."

In that case the bank sued the Burnses on certain notes which they had executed to Julius Boesel. The defense was that the notes were obtained by Boesel by fraud and without consideration, and that the bank had knowledge of the fraud and want of consideration at the time the notes were transferred to it, and, therefore, was not an innocent holder. The only knowledge that the bank had of the fraud and the want of consideration was the knowledge that Boesel had. Boesel was the president and active manager of the bank, and sold the notes to the bank, and in doing so he acted for himself personally,

and also for the bank in purchasing the notes; and no other officer or person connected with the bank had anything to do with the transaction. In holding that the bank was charged with Boesel's knowledge of the fraud the court said that "Boesel, as manager of the bank cannot unknow what Boesel the man all the while knew." And in conclusion it was said that "To hold otherwise would open the widest possible door for all sorts of fraud; the more atrocious and aggravated the fraud, the less the likelihood of fixing the liability upon the principal. Why? Because the agent would be the less likely to communicate the fact to the principal. Such a holding has no place in sound business or good morals and ought not to be encouraged by our courts."

With respect to these four checks the chancellor based his decree upon the finding that Partee was the secretary-treasurer and manager of the Land Company, with authority to draw checks upon its account, and that the bank was not required to see to the proper application of the proceeds of such checks. And he was of opinion that the case was governed by the recent ruling of this court and the Supreme Court in a memorandum opinion denying a writ of certiorari in the case of City Gas & Service Station et al. v. Frank S. Taylor et al., Lake Equity Docket, unreported. Without reviewing the facts of that case, it is sufficient to say that it is readily distinguishable in very material respects from the case at bar, and from the cases of Smith v. Mercantile Bank, supra, and Barry v. Hensley, Adm'r, supra, and People's Bank & Trust Co. v. Potter, supra, which we think are controlling here. The Mercantile Bank and the Hensley cases are discussed in the Gas & Service Station case, and are said to be readily distinguishable in the material facts, and the decision was predicated mainly upon the ground that if the complainant, as the surviving partner of Hardison, the wrongdoer, was granted a recovery, he would have to account to Hardison's estate for behalf of it, the mere suggestion of which was said to be shocking to the court.

We think this feature of the case falls within the qualification of the exception to the general rule with reference to imputed notice, so as "to bring within the general rule which charges the principal with the knowledge possessed by the agent, cases where the officer, though he acts for himself, or for a third person, is the sole representative of the corporation in the transaction in question." Smith v. Mercantile Bank, 132 Tenn., 147, at page 150, 177 S. W., 72, at page 73.

We think, therefore, that the chancellor was in error in denying the petitioner's claim with reference to these four checks. The checks amounted to $1,700. Mr. Partee restored to petitioner's account the sum of $325 and paid for it certain tax items, amounting to $150.93, leaving a balance of $1,224.07 owing to the Land Company, for which amount the petitioner is entitled to a decree.

The $1,000 check involves a different state of facts. This check was drawn by Partee on the account of the Ripley Land Company in favor of Partee Insurance Agency on January 13, 1939, was paid by the bank on that date, and bore a stamped endorsement on the back, "Credit to the account of the within payee, Ripley Savings Bank & Trust Co." The amount was not in fact credited on the account of the Partee Insurance Agency in the bank, but was applied on certain debit memoranda against the Insurance Agency in excess of $1,000 which were being carried as cash items in the bank's cash drawer. These debit charges were for cash advances made by the bank to insurance companies in payment of obligations of the Partee Insurance Agency for premiums due. By reason of these debit memoranda, the Partee Insurance Agency was overdrawn in the bank in excess of $1,000. So the Partee Insurance Agency received the benefit of the $1,000 represented by this check. The Partee Insurance Agency was a partnership firm composed of G. M. Partee, W. Dan Majors and W. I. Stewart, who were president, cashier and assistant cashier, respectively, of the bank. This $1,000 transaction was known to and actively participated in by Partee, Majors and Stewart.

Contemporaneously with the issuance and payment of this check on January 13, 1939, there was placed in the cash box of the bank a deposit slip indicating a deposit of $1,000 by the Ripley Land Company on that date, but no deposit was actually made by the Ripley Land Company on that date. This deposit slip was written in the handwriting of W. I. Stewart, assistant cashier of the bank, and was carried as a cash item to offset the $1,000 check charged to the Ripley Land Company on that date.

The bank suspended business on April 24, 1939, and was taken over by the superintendent of banks as of that date. The audit showed that there was a shortage of cash of $79,590.52 as of that date as evidenced by credit memoranda and deposit slips in the cash box of the bank which were being counted as cash. These items, including the $1,000 deposit slip in the name of the Ripley Land Company, were credited on the accounts of the depositors as of that date. When this item had been credited to the account of the Ripley Land Company, it showed a balance of $1,127.55. Later, upon satisfactory evidence that the Ripley Land Company had not made any deposit on January 13, 1939, the auditors charged back this $1,000, which reduced its credit balance to $127.55. The FDIC acknowledged liability for this amount and paid it, without prejudice to the right of the Land Company to prosecute its claim for the $1,000 wrongfully withdrawn by the check of January 13, 1939.

With respect to this item the chancellor found as a fact and we concur in his finding, that "on January 13, 1939, the Partee Insurance Agency, a customer of said bank which had a deposit account in said bank, said agency being composed of G. M. Partee, president of the

bank, W. Dan Majors, cashier of said institution and W. I. Stewart, assistant cashier, owed the bank $1000.00 or more. This was evidenced by overdraft. At that time Stewart drew a check for $1000.00 (on the account of the Ripley Land Company) which was signed by Partee and which was used to offset that amount of said Insurance Agency's debt. . . . This transaction was known to and participated in by those officers of the Land Bank who were also owners of said Insurance Agency, and one of whom was the officer of petitioner authorized to draw its checks.''

He was of opinion that the knowledge of the bank's officers of the fraud was not imputable to the bank, and he accordingly dismissed the petition as to this claim also.

The important fact about this transaction is that the Partee Insurance Agency's overdraft was diminished by $1,000, and the bank profited by the transaction to that extent. The statement is made in the brief of appellee that the Insurance Agency received the benefit of the transaction because it received credit for the $1,000 on its overdraft, but the sum total of its indebtedness was not reduced, for whereas it owed the bank $1,000 less, it owed the Land Company the $1,000 which it had fraudulently obtained.

We cannot concur in the holding of the chancellor that the knowledge of the chief executive officers of the bank should not be imputed to the bank in such a case. The overdraft of the Partee Insurance Agency constituted an indebtedness of these very officers of the bank. They knew of and participated in the theft of the money from the Land Company's account to pay on their indebtedness to the bank. They were representing the bank as well as themselves in the transaction, and the bank must be held chargeable with their knowledge that they were paying their debts with stolen money.

In a similar case the Supreme Court of West Virginia said in Knobley Mountain Orchard Co. v. People's Bank, 99 W. Va., 438, 129 S. E., 474, 476, 48 A. L. R., 459, 462:

''It was to the interest of the bank to have these overdrafts adjusted; but the bank may not close its eyes to the fact that these payments were made with money which the debtors had no right to use and its cashier no right to receive. In attempting to avail itself of the acts of its cashier to its advantage, the bank becomes subject to those to its disadvantage.''

Numerous cases supporting this view are referred to in a note to this case as reported in 48 A. L. R., 464, and in the notes to Brookhouse v. Union Publishing Co., 73 N. H., 368, 62 A., 219, as reported in 2 L. R. A. (N. S.), 993, 6 Ann. Cas., 675, and 111 Am. St. Rep., 623. And see, also Emerado Farmers' Elevator Co. v. Farmers' Bank, 20 N. Dak., 270, 127 N. W., 522, 29 L. R. A. (N. S.), 567.

The bank has received the benefit of the fraud of its three executive officers in this transaction; and by retaining the benefit of

their fraud, it must be held to have ratified their acts, and to be chargeable with their knowledge of their fraudulent conduct.

We think the chancellor was in error in holding that their knowledge of the fraud in the issuance and cashing of this check would not be imputed to the bank.

It results that the decree of the chancellor in dismissing the Land Company's petition will be reversed and a decree entered here in favor of the Ripley Land Company and against the Receiver and the FDIC for the sum of $2,224.07. The costs are adjudged against the appellees.

Anderson and Felts, JJ., concur.