CLARKE, Superintendent of Banks, v. RIPLEY SAV-
INGS BANK & TRUST CO. Intervention of
HOWARD.—181 S. W. (2d) 386.

Western Section, at Jackson. December 14, 1943.

Petition for Certiorari denied by Supreme Court, May 4, 1944.

388

Steele & Steele, of Ripley, for receiver.

James M. Kane, of Chicago, Ill., for Federal Deposit Ins. Corporation.

KETCHUM, J. This case is before us on the intervening petition of S. A. Howard filed in the cause brought by H. B. Clarke, Superintendent of Banks, for the purpose of winding up the affairs of the Ripley Savings Bank & Trust Company as insolvent. Howard seeks to recover of the receiver and the Federal Deposit Insurance Corporation, hereinafter referred to as the FDIC, the sum of $2,500 which he deposited in the bank on December 7, 1938, but which was embezzled by G. M. Partee, W. Dan Majors and W. I. Stewart, the president, cashier and assistant cashier, respectively, of said bank, and never credited to his account on the books of the bank. The receiver and the FDIC denied liability on the ground that the bank had never gotten the benefit of the deposit, and that on March 1, 1939, Howard had loaned the money to the G. M. Partee Insurance Agency, a partnership com-

posed of G. M. Partee, W. Dan Majors and W. I. Stewart (the defaulting officers of the bank) and accepted its note endorsed by the said Partee, Majors and Stewart, for same; and had afterwards filed his claims based on said note, under oath, against the estates of the said Partee, Majors and Stewart, in bankruptcy, and had received the dividends allowed and paid on said claim from said bankrupt estates; and that he was thereby now judicially estopped to maintain his action against the receiver and the FDIC for said deposit.

On the hearing of the cause the chancellor dismissed the petition upon the following grounds which are set forth at length in his finding of facts embodied in the decree, to-wit:

(1) "That the petitioner did not make a deposit of $2500 in the Ripley Savings Bank & Trust Company on December 7, 1938," etc.;·

(2) "That the petitioner S. A. Howard loaned the said $2500 to the G. M. Partee Insurance Agency and took its note for the same endorsed by G. M. Partee, W. Dan Majors and W. I. Stewart, and accepted said note well knowing that he had made said loan"; and

(3) "That he had filed his sworn claims based on said note against the estates of the said G. M. Partee, W. Dan Majors and W. I. Stewart, in bankruptcy, and had received the dividends allowed and paid on said claims, and had joined as one of the petitioning creditors in the involuntary bankruptcy petition filed against the said William I. Stewart; and that the petitioner is estopped by reason of having accepted said $2500 note and prosecuting his petition against William I. Stewart . . . and that the petitioner is estopped by his said acts from making any claim against the receiver of the Ripley Savings Bank

& Trust Company and the Federal Deposit Insurance Company".

There are six assignments of error in this court, all predicated upon the foregoing findings of the chancellor and upon his action in dismissing said petition.

It is shown in the proof, and appears to be conceded by all parties, that G. M. Partee, W. Dan Majors and William I. Stewart, the president, cashier and assistant cashier, respectively, of the Ripley Savings Bank & Trust Company, had for a long time prior to the failure of the bank been embezzling its funds, with the result that at the time of the failure their shortages amounted to approximately $80,000. One of the methods employed by them was in receiving deposits and entering them on the customer's pass book, stealing the money, and withholding the deposit slips, so that the deposits would not be entered on the customers' accounts on the books of the bank. These thefts were generally committed by Stewart, the assistant cashier, who received the deposits at the window, and he kept the record of the deposit slips that were withheld. Partee and Majors were equally guilty with him, however, and the stolen deposits were generally in some way handled through the G. M. Partee Insurance Agency, a partnership composed of the said Partee, Majors and Stewart. Partee, Majors and Stewart all admitted their peculations, plead guilty in the Federal Court at Memphis, and all were sent to the penitentiary.

The petitioner and his brother D. L. Howard sold their farm to Mrs. Effie Kennedy on December 7, 1938, and petitioner received Mrs. Kennedy's check for $2,500 for his half interest and D. L. Howard received her check for $500 and another tract of land for his share. Petitioner deposited his $2,500 check and received a duplicate deposit slip which was afterwards surrendered and the

deposit entered on his pass book. D. L. Howard presented his check for payment and received $500 in cash. Both of the checks bear the stamped notation on the back thereof: "Deposit to the account of the within named payee. Ripley Savings Bank & Trust Co." Petitioner's deposit slip was withheld and it was never entered as a credit on his account on the bank's books. These same officers had also been withholding deposits from Mrs. Kennedy's account so that her balance, according to the bank's books, amounted to only $245.16 on December 7, 1938. On December 29th a false entry was made crediting her account with $3,000 to cover the two Howard checks, and the checks were charged to her on that date.

After the failure of the bank and when it appeared that there was a shortage the receiver called upon all of the depositors to bring in their pass books to be balanced. Mr. Hurt the liquidating agent of the bank admits that this deposit had been duly entered on petitioner's pass book.

On this proof we think the chancellor was in error in finding that petitioner did not deposit the $2,500 in the bank. The endorsement on the back of the check "Deposit to the account of the within named payee", the entry of the deposit in petitioner's pass book, and Hurt's testimony, all indicate that the deposit was regularly made, and there is no evidence to the contrary. The first assignment of error is therefore sustained.

The petitioner is a farmer by occupation, wholly illiterate, and can neither read nor write. He had known Partee for forty years, had confidence in him and frequently called upon him for advice in business matters. Partee knew that he wanted to invest his money in another farm and tried to sell him some land that the bank owned or had an interest in. Lee Watkins a real estate agent tried

to sell him several places but said Partee kept Howard from buying from him. As he expressed it, he wasn't a good enough friend of Howard's. Watkins said Partee told him he did not want this money to get out of the bank. Howard says that after he had spent two and a half or three months trying to find a place to suit him, Partee called him into the bank and advised him to get a "bank certificate" (meaning a certificate of deposit) which would bear interest at 2½ per cent for a year, that the bank was solvent, and that the Government would be behind the certificate; and that if he found a place to suit him the bank would let him have the money on the certificate to buy it. And he says Partee gave him a paper which he thought was a "bank certificate" due in a year, but which he afterwards learned was a note of the G. M. Partee Insurance Agency due in one year, with interest at 2½ per cent, and endorsed by Partee, Majors and Stewart. He says Partee told him to show it to Monroe Carney who was the county register, and ask him if it was not all right. Carney told him it was the note of the Partee Insurance Agency but that he thought it was good, as Partee had $100,000 worth of real estate. He said he replied that he was not loaning money, and that he went to see James T. Haynes, an attorney, and that Haynes told him that it was a note and that he did not think it was a good note; and that he then "headed for the bank" but when he got there Partee had gone, so he left the note with Sam Berg for two days, and that he then returned it to Partee, and that he did not see it again until after the bank failed.

This note was dated March 1, 1939. On March 8th Howard bought a tract of land from P. B. Caldwell after getting Partee's advice. As a part of the consideration he assumed the payment of a Federal Land Bank loan of

$1,600 and executed his note for the balance of $1,140. Partee agreed that the bank would discount this note and the matter was handled in this way. This was probably the same day that Howard returned the $2,500 note to Partee. Howard says that a short time after the bank failed he received the Partee Insurance Company note in the printed envelope of the Ripley-Savings Bank & Trust Company. He doesn't know who sent it, whether Partee or agents of the receiver.

Hurt, the liquidating agent, testifies that this note was not among the assets of the bank at the time it failed, but that when the bank examiners learned about it, Mr. E. A. Jackson, a certified public accountant who represented one of the bonding companies, went out to see Howard at his home, and upon his return to the bank, reported that Howard said he had loaned the money to the Partee Insurance Agency and showed him the note; and upon learning this the receiver denied liability for the deposit. Jackson is now dead and his testimony is not in the record. Hurt's testimony as to what Jackson said was not objected to, and the chancellor finds as a fact that it was true notwithstanding Howard's emphatic denial that he made any such statement. Hurt's testimony was clearly inadmissible as hearsay and we think the chancellor should not have considered it.

There is no claim that Howard drew any check against this deposit, and we do not think that the weight of the evidence supports the chancellor's finding that he loaned the money to the Partee Insurance Agency, and accepted its note at any time prior to the bank's failure. If he accepted it at all it was after he received it in the mail after the failure of the bank. We therefore sustain the second assignment of error which complains of the chancellor's finding that Howard loaned the money to the

Partee Insurance Agency at any time before the failure of the bank.

Howard was greatly disturbed when he learned of the failure of the bank. Mr. Haynes says he came to his office and that he was in a very disturbed state of mind and did not have sufficient control of himself to say what he had done. Howard says he was "excited" when he received the note through the mail after the bank failed, that he did not know what to do, and that he went to see Burton Sanford, an attorney at Ripley, and left the note with him. He says that Sanford said he did not know what he would do,—whether he would sue the bank or "work on Will Stewart's farm". He was told that Sanford investigated the records at the bank. Sanford afterwards probated Howard's claim, based on this note, against the estates of Partee, Majors and Stewart, in bankruptcy, and had Howard join as one of the petitioning creditors in filing an involuntary petition in bankruptcy against Stewart. Howard's claim was allowed against all of said estates and he received dividends of about 12½ per cent from the Partee estate, about 5 per cent from the Stewart estate and about 1½ per cent from the Majors estate. Although Howard in his deposition denied that he filed his claim against these estates or that he received any dividends on it, the records show conclusively that he did, and copies of the dividend checks payable to his attorneys are in the record. In the proofs of his claims the Partee Insurance Agency note is described in detail and it is averred that it was given for borrowed money.

Mr. Sanford died in April, 1940. Howard says Sanford represented him as his attorney up to the time of his death, and his present solicitors Mr. C. S. Carney, who is now in the army, and Messrs. Craig & Durham, of Ripley, have represented him since that time.

 Upon the evidence above set out we find as a fact that after the failure of the bank, and after Howard received the Partee Insurance Agency note through the mail, he elected to prosecute his claim on the note against the estates of Partee, Majors and Stewart, in bankruptcy; and having prosecuted these claims on said note to a finality in the bankruptcy court, and having accepted the dividends allowed on said claims, he is now judicially estopped to maintain his present action against the receiver and the FDIC as a depositor in the bank.

If he loaned the money to the Partee Insurance Agency on March 1, 1939, as he avers in his sworn petitions in the three bankruptcy proceedings, then he did not have it on deposit in the bank at the time it failed. The two positions are inconsistent with each other and cannot stand together.

 It is argued with much earnestness on behalf of the petitioner that he is not estopped by his action in proving his claim against the estates of Partee, Majors and Stewart in bankruptcy because the receiver and the FDIC have not in any way been prejudiced thereby; but on the contrary, have been benefited to the extent of the recovery he has had from the bankrupt estates; for it is conceded that the amount of the recovery he has had will be deducted from the total amount he is entitled to recover from the receiver and the FDIC. This is the rule where an equitable estoppel or an estoppel in pais is relied upon. Rogers v. Colville, 145 Tenn., 650, 660, 238 S. W., 80; Southern Coal & Iron Co. v. Schwoon, 145 Tenn., 191, 226, 239 S. W., 398, 409. But the distinction between an equitable estoppel and a judicial estoppel is pointed out by Special Judge Smith in the Schwoon case, where it is said:

"In order for the matter pleaded to constitute an equitable estoppel, it must appear that the pleader has been prejudiced in his rights in some way thereby. . . .

"This doctrine, as we have seen, can only be invoked generally by persons who have been prejudiced. But the exception which entitles any party, whether prejudiced or not, to invoke the doctrine constitutes what has been referred to in the decisions as judicial estoppel."

In Sartain v. Dixie Coal & Iron Company, 150 Tenn., 633, 647, 266 S. W., 313, 317, Special Judge Malone points out that the term "judicial estoppel" indicates that class of estoppels arising from sworn statements made in the course of judicial proceedings; that it is based solely upon the public policy which upholds the sanctity of an oath, and precludes a party who has made a sworn statement, even in another litigation, from repudiating the same when he thinks it is to his advantage to do so; and as he expressed it, it might well be termed "estoppel by oath."

The leading case on the subject in this State is Hamilton v. Zimmerman, 37 Tenn., 39, 48, where it is said that

"This doctrine is said to have its foundation in the obligation under which every man is placed to speak and act, according to the truth of the case; and in the policy of the law to suppress the mischief from the destruction of all confidence in the intercourse and dealings of men, if they were allowed to deny that, which by their solemn and deliberate acts, they have declared to be true. And this doctrine applies with peculiar force, to admissions or statements made under the sanction of an oath, in the course of judicial proceedings. The chief security and safeguard for the purity and efficiency of the administration of justice is to be found in the proper reverence for the sanctity of an oath."

In Phillips v. Rooker, 134 Tenn., 457, 462, 184 S. W., 12, 13, the court in an opinion by Mr. Justice Williams, say that an

" 'Election of remedies' may be defined to be the adoption, by an unequivocal act, of one of two existing alternative remedial rights, inconsistent and not reconcilable with each other, the effect of which is to preclude a resort by the plaintiff or creditor to the other.

"If the obligation be a thing single, it seems inconsistent to allow complainants to hold two such distinct persons or set of persons liable as their contractees."

In Grizzard v. Fite, 137 Tenn., 103, 108, 191 S. W., 969, 970, L. R. A., 1917D, 652, the court in an opinion by Mr. Justice Lansden state the rule in the following language:

"In cases where two or more inconsistent remedies are given, which depend upon inconsistent facts, and which must result in the suitor assuming a position inconsistent with the position which he must afterwards assume to prosecute the alternative remedy, an election, deliberately made with full knowledge of the facts and without fraud or imposition upon the part of his adversary, works a judicial estoppel whether the adversary has been injured thereby or not. The rationale of the doctrine is that courts will not permit suitors to solemnly affirm that a given state of facts exists from which they are entitled to particular relief, and then afterwards affirm, or assume, that a contrary state of facts exists from which they are entitled to inconsistent relief."

Mr. Justice Williams dissented in this case upon the grounds that in the prevailing opinion the court had failed to make the distinction between the "election of remedies" and the "election of remedial rights". And he says:

" 'Election of remedial rights, is a choice between two

inconsistent substantive rights, either of which may be asserted at the volition of the chooser alone, who, however, cannot enjoy the benefit of both. Such an election goes not to form but to substance, affecting some right or title selected. Such choice perforce discards the alternative inconsistent right or claim.' ''

The test of inconsistency in the election in such cases is whether the assertion of one claim or remedy necessarily involves the negation or repudiation of the other. 18 Am. Jur. "Election of Remedies", sec. 12, page 135.

The petitioner is here in the position of having asserted under oath that he loaned his money to the Partee Insurance Agency and accepted its note for it, by making proof of his claims based on the note in the bankruptcy proceedings and accepting the dividends allowed thereon. He is therefore judicially estopped to assert in the present case that his money remained on deposit at the time of the bank's failure. The third assignment of error will be overruled.

This is determinative of the case and the detailed consideration of the remaining assignments of error is unnecessary. It results that the decree of the chancellor dismissing the petition is affirmed at the cost of the petitioner.

Decree accordingly.

Anderson, P. J., concurs.

Baptist, J., dissents.

ANDERSON, P. J. (concurring). I concur in the result in this case as set forth in Judge KETCHUM'S opinion, but am unable to agree to some of the rulings made therein.

I agree that the chancellor erred in holding that the petitioner did not originally deposit the $2,500 in the bank.

This deposit created the relation of debtor and creditor between him and the bank. The fact that the bank did not credit the petitioner's account with this amount is, I think, immaterial and not controlling. That he did not formally draw a check against the deposit is also immaterial. A verbal order to a bank to pay a sum of money is no less binding than a written one in the form of a check. If Partee and his associates originally took the money without authority from the petitioner, the bank would nevertheless be discharged from its obligation of a debtor if the petitioner, having knowledge of the facts, thereafter expressly or impliedly ratified that transaction, which I think the weight of credible evidence shows that he did.

I am unable to agree to the ruling that Hurt's testimony quoting Jackson to the effect that petitioner told him that he had loaned the money to the Partee Insurance Agency, should not have been considered by the chancellor. It is true that this was hearsay evidence and upon seasonable objection would doubtless have been excluded; but there was no objection of any kind, and this being true, it was proper that it be considered for whatever it was worth. The applicable rule, as I understand it, is that except where its incompetency derives from some statutory provision, incompetent evidence, admitted without objection, must be considered by the trier of fact. It was so held in Erlich v. Fisher, 114 Tenn., 711, 88 S. W. 188, and we have followed that holding a number of times. Smith v. Fisher, 11 Tenn. App., 273, 286; General Outdoor Advertising Co. v. Coley, 23 Tenn. App., 292, 296, 131 S. W. (2d), 305; Ward v. Gulf M. & N. R. Co., 23 Tenn. App., 533, 543, 134 S. W. (2d), 917. In these circumstances the fact that evidence is hearsay goes to its probative value, not to its competency.

I am also unable to agree to the conclusion that the

weight of the evidence does not support the chancellor's finding that the petitioner loaned the money to the Partee Insurance Agency. I think the weight of the evidence shows that he either loaned it to that concern originally or thereafter agreed in substance and effect to look to it instead of the Bank for payment. In short, he agreed to substitute the Partee Insurance Agency for the Bank as his debtor. Any other conclusion is necessarily based upon the testimony of the petitioner. I am unable to give his testimony any credit. He is contradicted by disinterested witnesses on practically every controverted question of fact, to say nothing of his own oaths made in connection with the bankruptcy proceedings. If his testimony is true in this case, then he was guilty of perjury in two or three instances in the bankruptcy proceedings. He not only denies that he filed a claim against the bankruptcy estate and that he joined in any of the bankruptcy proceedings, but he denies that he had ever received a dividend from those estates. As Judge KETCHUM points out, it is conclusively shown by record evidence that these denials are absolutely false.

In the same connection it is worthy of note that the petitioner received in the form of dividends from the bankrupt estate several hundred dollars. This sum he has neither returned nor offered to return. If his testimony in the present case is correct, there is no theory under which he was entitled to receive any amount from those estates. The only possible conclusion in that event is that he received it through practices involving fraud and perjury. The fact that he neither returned nor offered to return the amounts received from the bankruptcy court, considered with the other circumstances, is, in my opinion, an implied ratification of the transactions involved.

Should relief be granted in this case, petitioner would derive a wholly unwarranted benefit; for he would not

only have recovery from the Bank and the FDIC for the full amount of his deposit, but in addition he would be ahead the several hundred dollars he received from the bankruptcy court, solely upon the theory that he had loaned to the Partee Insurance Agency the very money for which a recovery had been allowed against the Bank. In my view there is nothing in the record to warrant such an anomalous result.

But if it be true that Partee and his associates perpetrated a fraud upon the petitioner in originally taking his money without his consent, yet I think that can avail him nothing under the facts of this case. One upon whom a fraud has been practiced has the sole option of whether he will be bound by it. If, with a knowledge of the fraud, he acquiesce therein or do any act importing an intention to stand by it, he cannot afterward avoid it, for the deceit then becomes an agreed fact of the case. It has been so held a number of times. Among the cases are Kuckolls v. Lea, 10 Humph., 577; Gilbert v. Hunnewell, 12 Heisk., 289; Johnson v. Lellyett, 12 Heisk., 723.

It would be a different case if the petitioner's position in the bankruptcy proceedings had been due to ignorance or mistake, but no such claim is made. As stated, the petitioner simply denies that he had participated in the bankruptcy proceedings in any capacity, notwithstanding the conclusive evidence to the contrary.

However, all other questions aside, I agree with Judge KETCHUM that the doctrine of judicial estoppel as distinguished from equitable estoppel, is an absolute bar to the granting of any relief to the petitioner in this case. It is significant to note that nowhere in the petitioner's brief does he undertake to combat this proposition. The brief is confined wholly to equitable estoppel, which is quite a different thing, as has been pointed out in num-

erous cases by the Supreme Court. Sartain v. Dixie Coal
& Iron Co., 150 Tenn., 633, 266 S. W., 313, and cases cited.

The distinctions between the two doctrines arise out of
the fact that whereas equitable estoppel is mainly con-
cerned with the private rights of individuals and operates
primarily upon them, judicial estoppel is based on public
policy and is primarily concerned with the public interest,
the rights of individuals being wholly subordinate and
incidental thereto. It not infrequently happens that as an
incidental consequence of the application of the latter
doctrine an individual derives benefit that he would not
otherwise be entitled to, yet that alone has never been
thought to prevent its application. The reason is that
the public interest is considered paramount, that is, that
it is thought to be more important that such interest be
subserved than it is that an individual be denied an un-
deserved benefit resulting incidentally from the appli-
cation of the doctrine. It is considered that the latter
is a less evil than that which would follow in the long
run from allowing a man to swear one thing in one ju-
dicial proceeding and directly the opposite in another
without any explanation of the inconsistency. The doc-
trine derives from the sanctity of an oath, the preserva-
tion of which has in this jurisdiction been considered of
first importance. Black Diamond Collieries v. Deal, 150
Tenn., 474, 265 S. W., 541; Stamper v. Venable, 117 Tenn.,
557, 561, 97 S. W., 812.

So it seems clear to me that if the essential basis of the
petitioner's position in the bankruptcy proceedings, to-
wit, that he had loaned the money to the Partee Insurance
Agency and that the individuals composing that concern
were his debtors, was in reality false in that he had not
made or ratified the loan to them as he now claims, yet
he would be estopped on the ground of public policy from

profiting as he seeks to do by asserting the truth. Cf: Williams v. Nottingham, 19 Tenn. App., 162, 84 S. W. (2d), 114.

It is of course vital to the application of the doctrine that the prior position was not taken through inadvertence or mistake. Here, there is no such claim. Upon the contrary, as before stated, the petitioner simply denies that he had filed a claim in any of the bankruptcy proceedings or in any way participated therein, notwithstanding the conclusive evidence to the contrary.

BAPTIST, J. (dissenting). I concur in the opinion of the majority that the petitioner, S. A. Howard, deposited in the Ripley Savings Bank and Trust Company a sum of $2,500 and that he did not loan the amount to the Partee Insurance Agency.

I do not concur in the opinion that the petitioner is judicially estopped to make his claim against the Bank by reason of his claim in the Bankruptcy Court against the estates of Partee, Majors and Stewart.

In the case of State v. Ripley Sav. Bank & Trust Company, 25 Tenn. App., 490, 160 S. W. (2d), 189, opinion by Judge Ketchum, arising out of the same bank failure, the president, Partee, drew certain unauthorized checks on depositor's accounts and appropriated the proceeds. In the opinion it is said at page 193 of 160 S. W. 2d:

"The bank has received the benefit of the fraud of its three executive officers in this transaction; and by retaining the benefit of their fraud, it must be held to have ratified their acts, and to be chargeable with their knowledge of their fraudulent conduct.

"We think the chancellor was in error in holding that their knowledge of the fraud in the issuance and cashing of this check would not be imputed to the bank."

In the instant case Partee, Majors and Stewart, acting as agents of the Bank, stole from this ignorant old man $2,500 and the Bank still holds the benefits of that theft.

In other words the Bank charged Mrs. Kennedy's account with the $2,500 check given to Howard, and did not credit Howard's account with any amount. As testified by Mr. Hurt, the liquidating agent, the Bank was, by this means, relieved of a liability of $2,500.

I do not think the cases cited in the majority opinion apply to the facts in this case, nor that the Supreme Court in any of the opinions cited intended that a plea of judicial estoppel should be allowed to the beneficiary of a theft.

In this situation, I think the Bank comes into court with unclean hands and is itself estopped from making such a plea.

In Corpus Juris Secundum, Vol. 31, p. 281, under the head of Estoppel, section 75, it is said:

" The doctrine of estoppel is for the protection of innocent persons, and only the innocent may invoke it. There is, in the very nature of the doctrine, some element of the maxim that one must come into a court of equity with clean hands. It is essential that the party claiming the benefit of the estoppel should have proceeded in good faith. A person may not predicate an estoppel in his favor on, or assert such estoppel for the purpose of making effective, obtaining the benefit of, or shielding himself from the results of, his own fraud, violation of law, wrongful act, or other inequitable conduct in the transaction in question; and the same is true of a fraudulent plan which he designed and an attempt to defraud in which he was an active participant."

I think the decree of the Chancery Court should be reversed and a judgment rendered in favor of the petitioner.