**STATE of Tennessee, Appellee,**

v.

**John H. CANDLER, Appellant.**

Court of Criminal Appeals of Tennessee, at Nashville.

Sept. 3, 1986.

Permission to Appeal Denied by Supreme Court Dec. 1, 1986.

John R. Martin, Atlanta, Ga., Jerry C. Colley, Columbia, for appellant.

W.J. Michael Cody, Atty. Gen., Albert L. Partee, III, Asst. Atty. Gen., Nashville, Joseph D. Baugh, Dist. Atty. Gen., Franklin, Don Schwendimann, Asst. Dist. Atty. Gen., Hohenwald, for appellee.

## OPINION

JOHN D. TEMPLETON, Special Judge.

John H. Candler was convicted on eight charges of violating the worthless check statute, T.C.A. 39–3–301. The judge ordered some of the sentences served consecutively and denied probation. On appeal, Candler submits as issues for review whether (1) the evidence was sufficient to establish the element of fraudulent intent, (2) the judge properly charged the jury on imputation of notice to the victim by notice to its agent that the checks were bad, (3) consecutive sentencing was proper, and (4) probation should have been denied. We decide the issues against appellant and affirm the judgment.

According to the state's proof, in 1982 appellant and Jerry C. Yokley were associated together in the business of marketing energy mangement tax shelters and had been since 1979. To prosecute the business, appellant used corporations he owned or controlled, including four called Callanwolde, Cybernation, Briarcliff and Colony Leasing. Yokley had corporations of his own, including one called Energy Master, although it appears appellant participated in the operation of Energy Master. The business generated substantial sales through 1981 but little or none after early 1982. Initially sales were made to individual investors in limited partnerships but in early 1982 appellant conceived the plan, and Yokley concurred, of selling to insurance companies. This new direction required time to bear fruit and no insurance company sales had been made by March 31, 1982. Appellant was solely responsible for implementing the new plan.

In 1982 and for several years prior thereto, Yokley was president and the officer in charge of Hohenwald Bank & Trust Company and owned or controlled a majority of the corporate stock. Some of the corporations used in the energy tax shelter busi-

ness, including Callanwolde and Energy Master, had accounts at Hohenwald Bank. The Bank had been criticized by examiners for allowing overdrafts and in early 1981 the Board of Directors ordered the practice restricted and interest charged on such overdrafts as might occur. Yokley continued to allow overdrafts, including some in the Callanwolde account. At least partly because of overdrafts, in late 1981 the examiners recommended an infusion of additional capital which, as finally agreed on, was in the amount of $370,000 and to be accomplished by March 31, 1982.

Appellant deposited in the Callanwolde account at Hohenwald Bank four checks dated March 30 and 31, 1982 and totaling $1,500,000. Under Yokley's direction, the Callanwolde account was granted immediate credit. In due course the checks were returned unpaid by the New York bank on which they were drawn but were not charged back against the Callanwolde account. They were either held or run back through and returned again. In the meantime, appellant drew checks on the Callanwolde account which were paid. $370,000 from the account went to Energy Master and thence to Yokley and then to the Bank for capital stock issued to Yokley.

Thereafter appellant deposited worthless checks in the Callanwolde account and received immediate credit under Yokley's direction as follows: 4–30–82 and 5/1/82, $1,800,000; 5/15/82, $1,800,000; 5/24/82, $2,148,000; 6/26/82, $2,608.000; 7/26/82, $3,840,000; and 8/13/82, $3,840,000. Since prior checks were charged back when new ones came in, the total credit extended was the $3,840,000. Yokley received some cash out of the account in addition to the $370,-000 but appellant realized cash, mostly by checks to his other corporations, of about $3,000,000. The Bank was declared insolvent and was closed in early September 1982. At the time some $464,000 of the credit had not been used and the Bank's loss was about $3,400,000 plus interest. Yokley had caused interest on overdrafts to be charged against the account.

The worthless checks were written on accounts in the names of Callanwolde, Cy-

bernation, Briarcliff and Colony Leasing on five different banks outside of Tennessee. The accounts never had more than a few thousand dollars in them and existed for only a few months. Colony Leasing had a regular account but the balance always was small.

From the state's proof, in particular the long series of worthless checks and the management of the Callanwolde account, it is reasonable to infer that Yokley knew the checks were bad. However, Yokley was called by the defense and confirmed that fact.

Yokley had been charged with appellant on the worthless checks but in connection with plea bargaining, these charges were nolled. He was sentenced to serve six years on two other charges of defrauding the Bank. Yokley testified that he was owed an amount for his share of the profits for 1981 and appellant claimed there were no funds to pay it. Yokley wanted to purchase the new capital stock in the Bank but had no money available for that purpose. Appellant claimed he needed money not only to pay Yokley but to operate the business until the insurance company sales were closed. Appellant assured Yokley the sales would close right away. Under these circumstances Yokley agreed to handle the first deposit of $1,500,000 to the Callanwolde account by giving immediate credit. And he described how under his direction the account thereafter was maintained to reflect the incoming worthless checks as valid deposits. Yokley did not disclose the matter to the Board of Directors. Indeed he could not because the disclosure would bring to light his own participation in the stock transaction. Also, he thought the $1,500,000 overdraft alone would render the Bank insolvent and cause it to close. According to Yokley, after the first deposit he had no control over appellant and was obliged to go forward with the scheme. He testified his only hope was the insurance sales would close. He was in contact with appellant daily and readily testified that both he and appellant knew all of the checks were worthless when deposited.

At trial appellant contended that the Bank had notice the checks were bad; that the transactions created merely the relationship of debtor and creditor; and consequently there was no showing of fraudulent intent. *Jones v. State,* 197 Tenn. 667, 277 S.W.2d 371 (1955). He argued that since Yokley knew the checks were bad, his knowledge must be imputed to the Bank in accordance with the general rule that the agent's knowledge is imputed to the principal. He recognized the exception that notice is not imputed to the principal where the agent is acting in his own behalf or his interest is antagonistic to that of the principal. But he relied on the exclusion from the exception, or exception to the exception, that the general rule applies and notice is imputed to the principal where the agent is the sole representative or alter ego of the principal in the transaction. *Smith v. Mercantile Bank,* 132 Tenn. 147, 177 S.W. 72 (1915); *State ex rel Clarke v. Ripley Savings Bank & Trust Company,* 25 Tenn.App. 490, 160 S.W.2d 189 (1941); *Griffith Motors, Inc. v. Parker,* 633 S.W.2d 319 (Tenn.App.1982).

The argument overlooks the matter of who may invoke the general rule in the first place. The rule imputing an agent's knowledge to the principal is designed to protect only those who exercise good faith and is not intended to serve as a shield for unfair dealing by the third person. The rule may not be invoked where third persons use the agent to further their own frauds upon the principal, or where the third person did not intend or expect that the agent would communicate the facts or the truth to the principal as where the third person colludes with the agent in acting adversely to the principal. *DeFord v. National Life & Accident Ins. Co.,* 182 Tenn. 255, 185 S.W.2d 617 (1945).

Although recognizing that in the trial appellant's claim of lack of fraudulent intent was founded on imputation of notice to the Bank, appellant now suggests the use of the rules of agency to impute notice as employed in civil law are inappropriate in a criminal case. He points out that the agency rules were designed to supply a guide in the assignment of civil liability between the principal and the third party to a transaction in which the agent has the same knowledge the third party has. He suggests the rules are not designed for use in the determination of the third party's criminal liability which focuses entirely on the criminal intent or mental processes of the third party. He reasons the true inquiry, therefore, is whether by conveying knowledge to Yokley the checks were bad appellant reasonably believed that he was conveying knowledge to the Bank so as to negate any finding that he intended that the Bank be defrauded by the worthless checks. He goes on to say that Yokley was the one in charge of the Bank, allowed large overdrafts in customer's accounts, including Callanwolde's, and granted immediate credit on checks. He argues that taking into account these and other facts disclosed by the proof, especially Yokley's exclusive charge of the Bank's business, appellant was justified in believing any communication to Yokley was a communication to the Bank. And he concludes these circumstances established a lack of fraudulent intent or at least a reasonable doubt thereof.

Professor Wharton says that in accordance with the principles of agency law the knowledge of an agent will be imputed to the principal where the defendant seeks to defraud the principal unless the agent has an interest adverse to his principal. Wharton's Criminal Law, 14th Ed.1981, Sec. 440. We think agency rules for the imputation of notice to the principal by notice to the agent may be applied in a criminal case.

Although absence of notice to the Bank was sufficient to support a finding of fraudulent intent there were other circumstances tending to establish the element. Appellant did not know precisely how Yokley was manipulating the Callanwolde account to keep the worthless checks afloat but knew it was being accomplished in some way. The opening of multiple accounts with relatively small balances in banks outside the state and shifting the flow of checks from one bank to another

could have been only to impart the appearance of legitimacy to the transactions. Since Yokley was familiar with the scheme, the practice was not calculated to impress him. It necessarily was to impress others who, acting for the Bank, might notice the complicated and confusing practice. When an examiner overlooked the condition of the Callanwolde account, Yokley reported he had "dodged the bullet". Appellant was bankrupt when the enterprise began, with several million dollars of his debts not dischargeable, and knew the Bank would not loan him money. His knowledge of how Yokley paid for the new bank stock, his callous reference to the Bank as his mastercharge, and Yokley's desperation as disclosed in the daily communications between the parties, all point in the same direction. Appellant well knew that information transmitted to Yokley was withheld from the Bank. Under well recognized rules, we review a finding here only to see whether any rational trier of fact could have found the essential element of fraudulent intent beyond a reasonable doubt. The absence of notice to the Bank aside, we think the other proof clearly supported the finding that appellant intended to defraud the Bank by means of worthless checks.

Appellant submitted special requests for charging the jury on imputation of notice, including the sole representative doctrine, and the state submitted requests which in substance told the jury the doctrine did not apply where the agent engages in an enterprise for the purpose of defrauding the principal. The judge indicated he would charge both requests. Appellant then, without waiving his objection to the state's requests and acting only in response to the allowance of them, submitted additional requests. We do not see the additional requests in the file but they appear in the record as a part of the oral colloquy between the judge and counsel. Of the eight paragraphs of the judge's charge copied below, appellant was the author of the first five paragraphs and the state of the last three.

A business institution such as a bank is charged with constructive knowledge regardless of its actual knowledge, of all material facts of which its officer or agent receives notice or acquires knowledge while acting in the course of his employment within the scope of authority, even though the officer or agent does not, in fact, communicate his knowledge to the institution.

There is an exception to this rule, however, where the agent is dealing with the principal in his own interest or where his interests are adverse to that of the principal so that it is to his own advantage not to impart his knowledge to the principal.

There is also a limitation to this exception sometimes referred to as the "sole actor" or the sole representative doctrine. This doctrine holds that the adverse interest exception does not apply when the transaction on behalf of the principal to which notice is sought to be imputed, is entrusted solely to the officer or agent having the knowledge.

The "sole actor" doctrine contemplates that the agent must have ostensibly as least endeavored to benefit his principal and even though he did not do so and his acts were for his personal benefit, possibly through defalcation, the third party who had obligated himself must have been under the impression that he was dealing with the principal.

In other words, if the proof shows that the third party was dealing with the agent for what he believed to be the benefit of the principal, even though it may not have in fact been for the principal, the principal is bound by the knowledge of the agent. But, if the facts show that through all the dealings the third party knew or must have known by the very nature of the transaction that the principal could not have had knowledge of what was taking place, he cannot be heard to charge the principal with knowledge.

The "sole actor" doctrine of imputing the knowledge and notice of an agent to a principal does not apply to a situation where the agent exceeds the scope of his agency by engaging in an enterprise for

the purpose of defrauding the principal or others.

If the agent or officer of a bank within the scope of his office had knowledge of a fact which it was his duty to declare, and not to his interest to conceal, then his knowledge is to be treated as that of the bank. For he is then presumed to have done what he ought to have done, and to have actually given the information to his principal, the bank.

But if the facts of the principal's situation were matters which it was to the agent's interest to conceal, the law does not by a fiction charge the principal, the bank, of which the agent was an officer, with notice of facts which the agent not only did not disclose, but which he was interested in concealing.

Appellant points out that since it was undisputed that Yokley did not actually disclose to the Board of Directors that the checks were bad and that it was in Yokley's interest to conceal the facts, charging the state's requests effectively destroyed the sole actor charge. Appellant argues that if the judge was going to charge on the agency rules at all, then neutering the sole actor doctrine with the state's requests denied appellant his right to a jury determination of whether he reasonably believed notice to Yokley was notice to the Bank.

We think, as already indicated, because appellant acted in collusion with Yokley to defraud the Bank by means of the worthless checks, the agency rules for imputing notice, including the sole actor doctrine, were not available to appellant. Appellant was impaled on the exception to the general rule that notice to the agent is notice to the principal, which exception is the general rule does not apply and notice is not imputed if in the transaction the agent acts in his own interest or adversely to the principal. In our opinion, appellant cannot rely on the sole actor doctrine, which nullifies the exception to the general rule, any more than he can rely on the general rule itself.

■ We think that since appellant claimed the benefit of the imputation of notice to the Bank, it was proper for the judge to charge the general rule and the exception thereto and error to charge the sole actor rule. As conceded by appellant, the charging of the state's requests tended to nullify and cancel out the sole actor charge. Since appellant was not entitled to the benefit of the rule anyway, we think the error was harmless and appellant was not prejudiced.

■ Appellant's claim that consecutive sentencing was improper rests mainly on lack of prior criminal convictions and the fact the checks were a part of one check kiting scheme that lasted only about five months. He submits there is no showing that he can be classified as a multiple offender or a professional criminal. Under recent legislation, we review the exercise of the judge's discretion de novo without a presumption of correctness.

Appellant deposited 45 checks in all but the state grouped them into eight groups consisting of from one to 23 checks in a group and charged only one violation for each group, making eight charges. The first six charges were for checks deposited before the effective date of the judge sentencing law and the last two for checks thereafter. The jury fixed the terms at three to five years on each of the first six convictions and the judge fixed the terms at five years on each of the last two. At the sentencing hearing the judge ordered the sentences on the first three convictions served concurrently with each other, on the next three concurrent with each other but consecutive to the first three, and on the last two, which were five years each, concurrent with each other but consecutive to the second three. He found consecutive sentencing was appropriate to protect the public from further criminal conduct by the appellant. The judge was of the opinion appellant fell within the classification of multiple offender and professional criminal as delineated in *Gray v. State*, 538 S.W.2d 391 (Tenn.1976). Also, he thought appellant was a dangerous person, although not a violent person.

■ Conduct that renders a bank insolvent is inimical to the interests of many, either directly or indirectly. It affects di-

■■■■■■■■■■■■■■■■

rectly stockholders, some depositors and some borrowers. It affects many indirectly when the government agency is compelled to meet its insurance responsibility. These facts alone might not justify consecutive sentencing but we think where the conduct of the accused is in reckless disregard of such interests, the conduct may be considered in connection with other facts. Once appellant in collaboration with Yokley began the scheme by presenting checks for $1,500,000, he did not merely cover the deposit with replacement checks in that amount. If he had done so and at the end the Bank had become insolvent on that account, his argument against consecutive sentencing might have merit. Instead, he took advantage of his position, and added to the spoils exacted from the Bank until he realized almost $3,000,000 for his own benefit. The process employed as already described extended over the space of about five months and ceased only when terminated by closure of the Bank. The record discloses no business activity of appellant during 1982 that yielded any substantial income except the worthless check activity.

■■■ We do not find it necessary to review the judge's observation that appellant with all his talents was a dangerous person although not a violent person. We agree with the judge that appellant should be classified as a multiple offender and as a professional criminal. From our de novo review of the record, we conclude that consecutive sentencing was proper.

■■■ Appellant submits the judge should not have denied probation. Appellant has no prior criminal record, has a family which he supports, participates in community activities, is a college graduate and a former member of U.S. Air Force Reserve, and has no alcohol or drug problems. However, many of the same matters mentioned in connection with consecutive sentencing are considerations here. After considering the entire record de novo, we find that the trial judge did not err in denying probation.

All of the issues are decided against appellant and the judgment is affirmed.

DUNCAN and TATUM, JJ., concur.